## FISHER & A. v. THE CONCORD RAILROAD & A.

DOE, J. In this case, the plaintiffs, Fisher and others, (claiming to be and admitted by defendants' counsel in argument to be,) stockholders of the Concord Railroad, having filed their bill against that corporation and its directors, treasurer, and clerk, move that the corporate property be allowed to remain in the hands of receivers, temporarily, until they can be heard on the merits of their case, in order that their rights may be preserved from impending danger. And, as to a part of that property, the court are agreed in granting the motion. The court are unanimously of opinion that the part of that property comprised in a certain judgment recovered by the corporation against a former conductor, should be held by a receiver; and a

special order is made to-day, carrying that unanimous opinion into effect.

This order is made on evidence taken in another suit in which all of these defendants are parties in interest, and nearly all parties of record. No one doubts that this evidence can be considered on the present motion. *Ex-parte* testimony is often heard on motions for temporary injunctions, and other interlocutory orders, which are sought in emergencies to preserve property provisionally, and to prevent damage until it can be decided, upon full investigation, whether the damage may rightfully be done. The evidence before us is free from the defects of *ex-parte* testimony. There is no meritorious or equitable objection to it. The only objections are purely technical, and such as are never regarded on preliminary motions of this kind. Very nearly the whole of the material evidence on the present motion, consists of the testimony of defendants and their associates, and the whole of it was taken with full examination or cross-examination by their own counsel upon ample conference and deliberation.

This evidence, on which the order is made, shows that the present directors were elected upon an understanding with said conductor that, in consideration of his powerful aid in their election, the suit of the corporation against him should be dropped, or the judgment should not be enforced, or, in some way, he should be protected or indemnified against it at the expense of the corporation. They were elected upon an understanding that they would sacrifice the interests of the corporation in that suit. This understanding, for all practical and legal purposes, is equivalent to the most formal engagement and pledge. The judgment in that suit is a part of the property of the corporation. The evidence satisfies the court that, in regard to that part of the property, there is danger against which the plaintiffs are entitled to be protected by having that part held in the hands of a receiver. And the only remaining question, upon the present motion, is, whether, by the evidence, the court can draw such a distinction between that part of the property and the rest of it, as to be able to say that, although the former is in danger, the latter is not.

The plaintiffs are stockholders; their suit is properly brought; their motion is properly before the court; the evidence is competent for the court to consider on the motion; the evidence shows danger against which the plaintiffs are entitled to be protected; the purposes of the directors are such that it is necessary to withhold from them a part of the corporate property. On these points there is no difference of opinion. The extent of the danger, is the point on which the court are not unanimous. The part of the corporate property which is in undoubted danger, is several thousand dollars; the rest of the corporate property is several millions. It being agreed that, as the evidence now stands, there is danger, and a necessity of avoiding it by holding the thousands in the custody of a receiver, the inquiry arises whether any part of the millions is in danger. It may be possible for millions to be perfectly safe where thousands would be in great peril. It may be in the power of imagination to suppose a case of one hundred and one dol-

lars in a single trust, where a receiver would be necessary for the one dollar, and not for the hundred. The question now is, whether this is a case of that extraordinary kind. The answer to this question is to be found in the facts of the case.

Under the management of the former board of directors, the Concord Railroad rose to the highest prosperity allowed by law. It was paying ten per cent. dividends on the par value of the stock; the payment of higher dividends was forbidden by the legislature. How much of this prosperity was due to a natural increase of the business of the road, and how much to its skilful and honest management, does not appear. But it does appear that the stockholders made no charges of mismanagement against the former board, and that if any such charges had been made, they would have been groundless. There was no apparent or suspected danger of any decrease of dividends or any depreciation of the value of the stock, under the management of the former board. One of the new board testifies that even " if a new road were constructed from Manchester to Concord," " in my judgment, the Concord road, with its present double track, splendid equipments, valuable property, and valuable leases, with judicious and economical management, and with the large increase of business that, in all probability, will be drawn to it, it would pay ten per cent." The management of the former board was judicious and economical. So far as the interests of the stockholders were concerned, there was no chance for improvement. The road was at the summit of lawful success. This was so palpable that the present board say they do not intend or hope to increase the dividends or the stock; and they could not increase either without violating the law. The stockholders, whose interests were identical with those of the corporation—the stockholders who had a purely stockholding interest—were perfectly satisfied, and there was every reason why they should be.

The former conductor was not satisfied. He owned a large amount of the stock, but his peculiar position rendered him hostile, in the highest degree, to the real stockholding interest. He had been discharged from the service of the corporation for alleged embezzlement of its money. A suit brought against him by the corporation to recover the money had been tried, and the result was adverse to him. A judgment against him was inevitable, and it was close upon him. More than two months before the election of the present directors, it had been decided by this court that judgment must be rendered against him, notwithstanding his vigorous effort to postpone the decision till after that election. His escape depended upon his organizing a party to buy stock, turn out the old board of directors, and elect a new board, upon an understanding that he should be relieved from the judgment, or in some way indemnified against it, at the expense of the corporation. Such a party was formed, stock was bought, and, upon such an understanding, the present board were elected, the former conductor leading the movement, and voting for them upon fourteen hundred and two shares. Not one of the directors pretends to doubt the legality or the justice of the judgment from which they have conspired to rescue him.

It was not to be expected that he could raise a sufficient force, for such a purpose, among the old stockholders who felt that the interests of the road were their interests, and that his high-handed rescue from such a judgment would be a greater disaster than the loss of the money involved in it.   The new board apparently consisted of seven persons; really it consisted of six; the seventh was merely a nominal member.   When the movement to elect them was started, a short time before the election, the six had no appreciable interest in the corporation.   One of them owned no more than four shares; another owned no more than two shares; and the other four were not stockholders.

This feature gave their enterprise so unfavorable an aspect that it was deemed necessary to bring in an old stockholder as a candidate to give an appearance to their ticket.   It was understood that this seventh member was merely to appear to be a member.   He was ostensibly put forward as a candidate for the office of director when it had been privately arranged that he was to be a mere titular director.   He was publicly held out as a candidate for the office of president of the road, when it had been secretly contrived that he was to be a mere honorary and temporary president, speedily to resign and retire from the board, and to take no active part at any time in the management of any of the affairs of the corporation.

The nominal candidate owned two hundred shares of the stock; and the par value of a share was fifty dollars.   It was thought advisable that he should appear to own a larger amount.   Three hundred shares were, in form, transferred to his name.   He gave a check for the amount of their par value when it was known that his associates were paying, in the public market, about seventy per cent. above par, at which price these three hundred shares had just been bought by one of the six.   At the election, when he voted on these three hundred shares, he made oath before a justice of the peace, as required by law (Gen. St., ch. 134, sec. 19), that he was the absolute and *bona fide* owner of them.   Soon after the election, his check was returned to him, and the three hundred shares were returned to their owner, according to the original understanding.   Here was a plain and very grave violation of law, committed for the purpose of giving a fictitious interest to a fictitious president whose name was used to give the new board delusive strength.   This elaborate fiction shows how their previous want of interest in the road looked to them, what they thought it was evidence of, and how much they felt its force; and the court cannot be any less impressed by it than they were.   They did not seek the control of the road for the purpose of protecting or advancing their interests as stockholders; they became stockholders for the purpose of obtaining the control of the road.   This fact was calculated to raise a suspicion so heavy that, in their judgment, it was necessary to take such pains, and use such means, to conceal the fact even partially under cover of a pretended president.   The fact thus attempted to be concealed, must have been, in their judgment, entitled to great weight against themselves; and it is entitled to as much weight in our judgment as in theirs.

The six real directors had no experience in the management of a railroad, and no substantial interest in this road until they purchased shares immediately before the election for the purpose of carrying the election. Then they and their friends bought a large amount. One of their agents, who bought " about five thousand shares" for them, testifies that " the average price per share" was " between $84 and $85." Their treasurer testifies, " some 10,000 shares were purchased by the whole, which would average, I think, at about $85, or from $83 to $85." Stock was bought to the amount of more than eight hundred thousand dollars, to carry the election. The evidence is indistinct as to the precise number of dollars borrowed for the purpose of buying the stock ; but, upon the evidence, there is no doubt that nearly the whole amount was so borrowed. The affair was not a natural and gradual overflow of surplus earnings or accumulating capital accidentally uniting in a single channel ; it was a spasmodic use of hired money in a joint project of large proportions and unusual character. Hired money may seek investment in railroad stock ; but this amount of hired money, in sudden concert, seeking investment in a single New Hampshire railroad, at a price carrying the interest below six per cent., with no probability of a profitable, legitimate speculation, and the investors denying on oath, as they do, all purposes of speculating or increasing the dividends or the stock, this is something not in the ordinary course of business.

To increase their facilities for borrowing money, it was deemed expedient to enlist managers of banks in the enterprise ; and numerous and large sums were obtained in this way. This perversion of banks was accompanied by various irregularities in disregard of sound banking policy, and of the laws of New Hampshire and of the United States. The funds and property of savings banks, in various parts of the State, were used by the managers of those institutions to make themselves and their associates managers of the Concord Railroad,— a transaction to be examined in two aspects.

In the first place, a savings bank is created by the legislature for a definite and limited object. It is not chartered as an elevator for lifting its managers to other places of honor or emolument. Its sole object is the preservation and increase of the savings of the depositors, even the accommodation of borrowers being merely incidental. And when the agency established by law for that purpose, is diverted, by the managers, to the purpose of acquiring for themselves the control of other corporations, there is a breach of trust and a subversion of the object of the legislature. This revolution overthrows the fundamental principle and changes the nature of savings banks, in which the public have a deep interest. It is a usurpation to be discountenanced and resisted whenever it appears in the administration of the law. The strict law on the subject is abundantly supported by practical considerations. The general use of the funds of savings banks for the accumulation of corporate power in the hands of their managers, cannot be contemplated without serious alarm. And in view of the magnitude of the danger arising from the present and prospective amount of

such funds and such power, it would be unfortunate if the abuse should be encouraged by the inaction and silence of courts.

In the second place, at common law, an agent or trustee, when authorized to sell property, cannot sell it to himself; when authorized to buy property, cannot buy it of himself; when authorized to loan money, cannot loan it to himself. This incapacity is a universal principle of law. It does not need to be published in the charters of banks; it is the law of the land. It is founded upon a general policy; is not shown by proof of fraud in a particular case; and is not avoided by proof of good faith and fortunate results. *Ex-parte James*, 8 Ves. 345; *Davoue* v. *Fanning*, 2 Johns. Ch. 260. It is an old elementary and familiar principle, established and maintained by the reason and experience of mankind. In making a sale, it is the duty of an agent or trustee to sell as high as possible; if he sells to himself, it is his interest to sell low. In making a purchase, it is his duty to buy as low as possible; if he buys of himself, it is his interest to buy high. In making a loan, it is his duty to obtain as high a legal rate as possible, and good security; if he loans to himself, it is his interest to take a low rate, and it may be his interest to take poor security. It is a violation of the confidence placed in him, to expose himself to temptation by bringing his personal interest in conflict with his fiduciary duty. However possible, or probable, or certain it might be, in a particular instance, that he would not feel, or would resist, the temptation, "he ought not," says Chief Justice RICHARDSON, "to be permitted to act where the temptation exists." *Perkins* v. *Thompson*, 3 N. H. 146. "He cannot," say the Supreme Court of the United States, "represent in himself two opposite and conflicting interests. * * * The law has wisely prohibited any person from assuming such dangerous and incompatible characters." *Wormley* v. *Wormley*, 8 Wheat. 441. "The policy of the rule," says Chancellor KENT, "is to shut the door against temptation." 4 Kent Com. 438.

If an agent or trustee, directly or indirectly, uses or manages, for his own benefit, the property, authority, or business committed to his charge, he is unfaithful; and it is no justification and no extenuation for him to show that no loss has happened. The violation of law is not in his meeting with a loss, and being unable to make restitution. The breach of trust is not in his bad luck. And any attempt to palliate his wrong by his accidental ability to restore what he was legally disabled to take, is calculated to weaken the sense of legal obligation, and to undermine the whole doctrine, the whole duty, and the whole safety of trusts. There is nothing peculiar in this age or this country to justify any relaxation of the ancient and stringent law on this subject. 2 Kent Com. 229, 618; 4 id. 307; 1 Story Eq. §§ 258, 307, 315, 316, 322; 1 Parsons Con. 86, 87 (5th ed.); *Michoud* v. *Girod*, 4 How. (U. S.) 503, 553–557; *Currier* v. *Green*, 2 N. H. 225; *Holton* v. *Smith*, 7 N. H. 451; *Martin* v. *Moulton*, 8 N. H. 506; *Sparhawk* v. *Allen*, 21 N. H. 9, 22–24; *French* v. *Currier*, 47 N. H. 98.

The law was well understood by the new board and their associates. The note of the manager of bank A, for $42,500, was given to bank B;

the note of the manager of bank B, for $42,500, was given to bank A. The mutuality of the loan deprived the funds of the disinterested and undivided fidelity of guardianship provided by law. The guards disarmed themselves. The circumlocution of their notes shows their knowledge of the law, and a premeditated purpose to elude it. With the $85,000, trust funds, thus illegally loaned by the managers to themselves, they bought Concord Railroad stock in furtherance of the common design. And there were other flagrant violations of law in obtaining other sums for the same purpose. Bank funds were taken by their managers under cover of the names of other persons. Various devices were resorted to.

The legislature immediately investigated these proceedings, and passed a special act to guard savings banks against the danger of their officers loaning to themselves the funds of the banks. Ten days after the passage of that act, it was set at naught by the six real directors and four of their associates. One of them, whose shares cost more than $200,000, called upon the others to assist him in carrying his burden. A note for $100,000, signed by all those ten persons except the manager of bank A, was given to bank A; another note for $100,000, signed by all except the manager of bank B, was given to bank B. With the $200,000 thus raised, this part of their burdensome investment was laboriously carried further on. These two notes display the same knowledge and disregard of the law, that had been previously exhibited, and show that all the real members of the new board consider their combination superior to all legal restraint.

The erroneous belief that a manager of a corporation, or any other agent or trustee, can evade his duty, circumvent the law of trusts, and use or manage the trust property for his own profit or advantage under any specious pretence or ingenious subterfuge, is a dangerous opinion for such a person to entertain. And the fact that he entertains and acts upon such an opinion in one trust, for the purpose of grasping another trust, is evidence tending to show that the latter would be in danger in his hands. When managers of banks use the trust funds to gain the control of a railroad for themselves and their friends and not for the banks, it is a natural conclusion that the railroad will be managed on the same plan. And the former conductor and his first adherents, who enticed into their scheme the managers of banks to be used in obtaining trust funds in violation of law, are not less responsible than the recruits whom they enlisted for that service.

The price paid for the railroad stock, was so great that ten per cent. dividends on the par value, would be less than six per cent. interest on the price. It is proved that the market rate of interest was not less than seven or seven and a half per cent., and that the banks were accustomed to take the market rate. For money hired from other sources than the banks which they controlled, of course more than six per cent. interest was paid. As to the money hired of those banks, the view most unfavorable to the defendants, would be, that they loaned bank money to themselves and their associates at a lower rate of interest than that taken from other borrowers. If they engaged or partic-

ipated in any favoritism, or peculation of that kind to gain the control of the railroad, it could not be claimed that the railroad would be safe in their hands.    But there is positive testimony that, on several of their bank loans, the interest was to be the market rate; and they are entitled to the presumption that it was so in all cases.    That is the view most favorable to them.    Taking it to be the correct view, they knew that the highest interest they could receive from the railroad stock, would be less than the interest they paid for the hired money with which they bought the stock.

They bought the stock with a mutual understanding, and were careful not to bid against each other; but their eager demand for it, at once carried up the price about twenty per cent.    There was no prospect, under legal management, that the price paid by them would be maintained, unless by suspicious struggles of factions for the control of the road, a contingency upon which they did not rely.    They paid more for the stock than they thought it would be worth in the market. They do not pretend that they had any hope of gain in a higher price; but they say they intended to keep the stock and not to sell it: and the future price would be of less consequence in a permanent investment, than in a speculation.    What were they going to keep it for?

If it had been legally possible to increase the dividends or the stock, the new board and their friends might have bought their stock for speculative purposes in that direction.    But this was legally impossible; and they deny that they had any such object in view.    What then was their object?    They were not engaged in an artless and aimless scheme. There was a great outlay of money, time, skill, and exertion; and it was not made upon a manifestly useless and unprofitable undertaking. There must have been an object of great consequence to be accomplished, besides the rescue of the former conductor, and they must be able to inform us what it was.    They have testified on this point. With one voice, they say they meditated an investment.    As the investment was made in expectation of a loss of principal and a loss of interest, and was chiefly of money hired for the purpose of being invested at a loss, it is evident that, on this vital point, their testimony is highly figurative.    On their oaths, explaining conduct that so much needs explanation, they declare their object was an investment, which, in the ordinary meaning of the term, was inconsistent with any rational system of finance.    The use of so common and plain a word in a sense so eccentric and obscure, agrees with the other evidence in pointing to an investment with mysterious profits.

Two of the directors give further explanations.    One, whose shares cost more than $100,000 of hired money, says that, in addition to the stimulus of an investment, he "felt a desire to be in control of the road, for the same reasons that men usually have, to be in power." Another, who sold his wife's government bonds to raise money for this enterprise, and "cannot state" how much hired money he used in buying shares at cost of more than $100,000, says that his purposes in buying them, were "First, for an investment.    Second, to do all I could to prevent consolidation;" that, in his judgment, "consolidation

would very seriously affect the local business of Concord and Manchester, and other places, and the interests of the people of New Hampshire;" and that he was "apprehensive that consolidation would be effected unless some movement of the kind which" he "made was attempted." Other directors say they are opposed to consolidation, but do not claim that the prevention of it, was one of their motives for seeking the control of the road.

It appears in the evidence that the Concord Railroad controls four other railroads with which it is consolidated. Estimated by the size of the State, this is a consolidation of great magnitude; but no one of the directors has any wish or intention to break it up. It also appears in the evidence that the Concord Railroad and the Manchester & Lawrence Railroad are naturally rival and competing roads; that the people of Concord and Manchester, and all whose channels of business pass through Concord or Manchester to Boston (comprising a large portion of the State), are interested in requiring those two roads to run as independent lines according to their charters; that their consolidation has been, and is, a cause of complaint; that the legislature have undertaken to dissolve it by a law made for that purpose; and that a suit has been brought to put that law in force. That suit, every one of the directors intends to contest. When it comes to trial, a different state of things may appear; but the evidence in this case is, that the people of New Hampshire have condemned this consolidation as an oppressive and illegal monopoly and a public evil, and decreed its overthrow by positive legislation. But the director, who claims that he volunteered to defend them against a consolidation not in existence, proposes to defend the existing one against them. The philanthropy of the movement is one of the explanations that needs to be explained.

Such is the testimony of the directors on the object of their combination and struggle. It decisively corroborates the other evidence in proving that their object was, a system of railroad management irregularly and wrongfully turned to the benefit of the managers and their associates.

And the testimony of their associates tends to the same conclusion. The effect of all their testimony is exemplified by one who hired "about $17,000" of a bank under their control to buy Concord Railroad shares, and pledged them to the bank to secure the loan, and voted on them for the present directors. He testifies that he did not buy the shares "for the purpose of voting on them for a new board of directors," and that there was not "any understanding or expectation," that, in the event of the election of a new board, he was "to be employed as an attorney for the corporation, or in any other capacity." He also says, "I paid from eighty-three to eighty-five dollars per share, * * * and for a permanent investment I regarded it as one of the best which a man could make, should he be taken away from his family." It is not unusual for thoughtful persons, preparing for the close of life, to pay their debts, and settle their worldly affairs; but running in debt for a losing investment encumbered beyond its value— entangling the man's business in such unaccountable embarrassment—

as a preparation for being taken away from his family, is a dark explanation, equally solemn in form, and mysterious in substance.

These are the facts of the case. If there had been any other facts having any bearing against the plaintiffs or in favor of the defendants, we must presume they would have been proved, or that time for proving them would have been asked, before the question arising on this motion was submitted by the defendants to the court for decision. The whole motion must be decided, as a part of it has been decided, upon the evidence. In the proved facts, is to be found the answer to the question whether this is a case in which millions are perfectly safe while thousands are in such peril as to require the protection of a receiver. Upon these facts, the conclusion must be, that this is not a case of that extraordinary kind.

How is so plain a conclusion to be avoided ? Are the court to disregard the evidence, and introduce the novel practice of deciding on their personal knowledge of the parties ? Nothing could be more illegal; scarcely anything could expose the impartiality of justice to greater risk. The equality of the law does not recognize one party as a friend, and another as a stranger. Judicial notice may be taken of certain matters of public history and general knowledge; but the character of a party in a suit, is not one of those matters. The court must try a case, as a jury would be sworn to try it, by the law and the evidence. If a juror has any personal knowledge of a party which would be admissible in evidence, the juror's personal knowledge does not become evidence, and cannot be taken into consideration, unless he testifies to it under oath, and submits himself as a witness to cross-examination. 3 Bl. Com. 375 ; Bac. Abr. *title* Juries (M) ; *O. G. L. & C. Co.* v. *Graham*, 28 Ill. 73, 79. And a judge must come under the same rule. The primary principles and simplest rudiments of the law, forbid the court to act judicially upon any knowledge of the parties except that furnished by the evidence. Moreover, if a judge has any competent testimony to give on that point, and if he gives it, there must be an opportunity to rebut it. Is he then to weigh his own testimony against that of other witnesses ? "It seems now to be agreed that the same person cannot be both witness and judge in a cause which is on trial before him." 1 Gr. Ev. § 364. But, if the court had any personal knowledge of these parties, and had testified on that point, and acted on their own testimony in coming to their unanimous conclusion that the thousands are in such peril as to require the protection of a receiver, there would be a difficulty in finding, on the same testimony, that the millions are perfectly safe without that protection.

The argument that the directors had a legal right to buy stock and gain the control of the corporate property for legitimate purposes, has been disposed of by the unanimous order of the court, this day made, specially witholding from them a part of that property. The argument does not reach this motion which raises the question of the purposes for which they sought the control. The former conductor had a legal right to buy stock ; but an extensive exercise of that right might have been evidence on the trial of his case. And the extraordinary

circumstances attending the purchase of stock in this case, throw a light upon the designs of the purchasers.

The argument that, as the directors own a large amount of the stock of the corporation, they can have no motive to misappropriate its funds, has also been disposed of by the unanimous order. If they owned all the stock, they could have no such motive; but their understanding with the former conductor, which imperils the thousands, shows that their ownership of a part of the stock, is not a sufficient security for the other stockholders. And their situation may be illustrated by his. On the trial of his case, his ownership of a large amount of the stock, could not have been regarded as evidence that he had no motive or interest to keep the funds of the road. *B. & W. R. R.* v. *Dana*, 1 Gray 101, 102.

To the argument that the plaintiffs do not own as many shares as the directors, the reply was made by counsel, that a single share is as much entitled to the protection of the law, as any number. The directors seem to think that the road practically belongs to them and their friends, and that the interests of the other stockholders are entirely at their mercy. Such a mistake is not to be encouraged. The majority of voters in a town meeting, do not own the town property, and have not an unlimited power to dispose of it; the law defends the poorest tax-payer against their wrongful proceedings. *Brown* v. *Marsh*, 21 N. H. 81. The same doctrine is applicable to other corporations, and has been applied, by this court, to a railroad, in a case where there was no actual fraud or intentional wrong, but merely an intention of the directors to act, in good faith, upon views of the law held by the court to be erroneous. *March* v. *E. R. R. Co.*, 40 N. H. 548, 567; S. C. 43 N. H. 515, 531, 532. The same doctrine is applied by the court to a part of the corporate property in this case.

The plaintiffs have interests to be protected, beyond ten per cent. dividends for the time being. As the commercial, mercantile, manufacturing, and agricultural industry of the country, the cost of the common necessaries of life, and nearly all kinds of property, are affected by the cost of railroad transportation; that cost is a matter of great concern to the public. It is the theory of New Hampshire law, that a railroad is a public highway, designed, and put in operation, by legislative authority, for the public accommodation; that its managers are public servants; and that a rate of fare or freight, higher than is necessary for paying ten per cent. and keeping the road in a reasonable repair and a suitable condition for public use, is an oppressive public tax assessed and collected by a corporate monoply created by the legislature. Gen. Stat., chap. 146, secs. 1, 2, 3; chap. 144, sec. 5. If the increasing business of this road would enable the directors to carry out their plans, and, at the same time, to pay the stockholders ten per cent. dividends, a stockholder would have as clear a right to complain as if he received but five per cent. He would have a right to complain, that the rates of fare and freight, were not constantly reduced to the standard of ten per cent. and necessary expenses, because earnings of the road misapplied by the directors would be

that oppressive public tax which is likely to arouse indignation and provoke legislation unfriendly to railroad interests. That is a danger against which each stockholder has a right to be protected; and that is one of the dangers in this case. Such a danger is not avoided by a reduction of rates, unless the reduction constantly reaches the point required by the policy of New Hampshire law. Whether it reaches that point must always be an open question, depending on the amount of business, and the use made of the road and its earnings by the directors.

If the directors should turn over to the former conductor, an amount equal to the judgment against him, and still pay ten per cent. dividends, that amount would be an oppressive tax illegally levied by them, on the public, for the benefit of that conductor. They were employed by him to levy that tax. If the road were put into their hands, what would hinder their levying the tax according to agreement? Withholding from them nothing but the judgment and its proceeds, would, as a legal measure, be a vain and idle ceremony. If it would have any practical effect, it would merely furnish them with a pretext for refusing to give him his stipulated share of the spoil. That would be an illusory and inadequate remedy for the plaintiffs, who are entitled to effectual and complete redress if they are entitled to any.

In the present state of things, the plaintiffs have a remedy which is sufficient for them and injurious to no one. The road is in the safe custody of the law, where it has been for several months. And the plaintiffs ask that it be allowed to remain there, temporarily, until they can be finally heard on the merits of their case, in order that their rights may be preserved from impending danger. Their case can undoubtedly be brought to a final decision within a few months; and their motion for continued protection, during that time, against the dangers shown by the evidence to exist, is a reasonable motion and ought to be granted; and no order ought to be made that would deprive them of the protection which they are now enjoying, and to which the evidence shows them entitled. If the present receivers are not acceptable to all parties, others can be appointed in their place, whose management of the road during that time will be satisfactory to all whom it may concern.

On the final hearing such a decree should be made as the evidence then offered shall require. If the evidence then offered makes a different case,—if it shall then appear that the plaintiffs have no rights, or that their rights are not in danger,—their bill should be dismissed, and the road should go into the hands of the directors. But if it shall then appear, as it now appears, that the plaintiffs have rights which are endangered by a conspiracy to manage the road for the illicit benefit of the managers and their friends, the plaintiffs will be entitled to protection as long as the danger continues. If it shall then appear that such a conspiracy has been abandoned on account of the exposure made of it by the evidence, such a state of things should be duly considered.

We are admonished that courts ought to be slow to interfere in cases of this kind. Unfortunately there is a precedent which might be cited in support of this admonition. There is a case in another jurisdiction in which courts have been slow to suppress a corporate management illicitly directed to the benefit of the managers, and in which a peculiar system of railroad principles has been rapidly developed. A dominion of railroad directors arose on a foundation of fraud, intimidation, and corruption. It perverted corporate power and personal trust, trampled down the rights of stockholders and the public, defied the law, absorbed the local government, overwhelmed a powerful State, and spread the demoralizing influence of its success. In resisting the extension of such a system, it is not the duty of the court to be slow.