Rockingham, }
June 6, 1911. }

### STATE *v.* BOSTON & MAINE RAILROAD.

The provision that rates for fares and freights shall not be increased on any railroads united under chapter 5, Laws 1889, applies to all consolidations effected thereunder, whether by lease, by union, or by purchase.

The act ratifying and confirming the lease of the Manchester and Lawrence Railroad to the Boston and Maine Railroad (Laws 1887, *c.* 301) did not release the road of the lessors from the restrictions as to increased rates contained in chapter 100, Laws 1883, under authority of which the lease was originally made.

The provision that rates shall not be increased on railroads leased or united, contained in the consolidation acts of 1883 and 1889 and in chapter 156, Public Statutes, is applicable to all lines leased or operated by the Boston and Maine Railroad under the authority thereby conferred, upon which there were existing rates on July 24, 1889; and to escape the restriction upon any leased line, it *is* incumbent upon the lessee corporation to show the assent of the state to its operation of. such railroad, expressed otherwise than through a statute containing the prohibition.

The statutory restrictions as to an increase of rates upon leased or united railroads apply only to lines operated by another corporation under authority conferred by the statutes imposing such restrictions.

BILL IN EQUITY, for an injunction against the collection of rates for fares and freights in excess of the amount permitted by law. Transferred from the October term, 1910, of the superior court by *Chamberlin,* J., upon an agreement as to the facts, for the purpose of determining what portions of the defendants' railroad system

are subject to the limitations as to rates imposed by chapter 100 of the Laws of 1883, chapter 5 of the Laws of 1889, and chapter 156 of the Public Statutes.

*Edwin G. Eastman*, attorney-general, and *Louis A. Thorp* (the attorney-general orally), for the state.

*Branch & Branch* and *Kelley, Harding & Hatch* (*Oliver W. Branch* orally), for the defendants.

PARSONS, C. J. By different methods forty separate corporations have been brought under the direct control of one to such an extent that for all practical purposes the forty constitute a single corporation. That this combination could have been brought about without the assent of the state is not claimed. Neither is it suggested that it is illegal or improper. It is recognized as the legitimate result of permissive legislation adopted mainly in 1883 and 1889, and re-enacted in the Public Statutes in 1891. This legislation contained a restriction against the increase of rates for fares and freights upon roads combined under it. *State* v. *Railroad*, 75 N. H. 327. The case is here upon an agreement as to the facts, for the determination of the question upon which of the roads included in the combination the restriction applies. In the agreement for transfer, the defendants conceded that it did apply to nine of the thirty-six original roads described therein. In their brief they add two to this list: the Wilton and the Peterborough and Hillsborough. They also state the facts as to four other roads not mentioned in the case: the Peterborough and Shirley, the Brookline, the Brookline and Milford, and the Nashua and Acton.

Reversing the prior policy of the state upon the subject, the legislature in 1883 authorized the incorporation of railroads by general law, provided for the consolidation of existing roads, and created a railroad commission with greatly enlarged powers. Laws 1883, cc. 100, 101. The portion of this legislation material to the present inquiry is: "Any railroad corporation may lease its road, railroad property, and interests to any other railroad corporation. . . . And two or more railroad corporations . . . may unite and form a new corporation: . . . *Provided*, that the rates for fares and freights existing August 1, 1883, shall not be increased on any part of the roads so leased or united, and the decrease in the operating expenses consequent upon the leasing or

uniting of any roads shall be met from time to time by a reasonable and just reduction of fares and freights." Laws 1883, *c.* 100, *s.* 17. Under this act certain leases were made, one of which failed because of lack of provision to secure the rights of stockholders objecting to the lease, which was held to be an unwarranted alteration of the partnership contract. *Dow* v. *Railroad,* 67 N. H. 1. After an unsuccessful attempt to obtain further legislation in 1887, an act was passed in 1889 which contained general provisions removing the objection considered fatal in *Dow* v. *Railroad.* The act was entitled an amendment of chapter 100, Laws of 1883. It contained provisions to meet this objection, and authorized the Concord Railroad and the Boston, Concord and Montreal to unite and form a new corporation, and certain other roads to lease to either or to the new corporation, and the Concord Railroad and the proposed corporation were authorized to acquire by purchase certain railroads. Similar authority was given other roads for lease to and purchase by the Boston and Maine Railroad. Laws 1889, *c.* 5. This act, which was approved July 24, 1889, provided:

"Sect. 16. No existing right of railroad corporations to lease to or unite with other railroad corporations shall be impaired by this act. And such corporations and their stockholders shall have all the rights and remedies given by this act.

"Sect 17. The rates for fares and freights existing at the time of the passage of this act shall not be increased on the roads leased or united under it, and the decrease in the operating expenses consequent upon the leasing or uniting of any roads shall be met from time to time by a reasonable and just reduction of fares and freights."

In the revision of 1891 (the Public Statutes), chapter 100, Laws of 1883, and section 1, chapter 5, Laws of 1889, were repealed. P. S., *c.* 288, *s.* 15, *pp.* 776, 783. By that revision, all limitations as to railroads that might be leased by others were abandoned (P. S., *c.* 156, *s.* 21); but sections 16 and 17 of chapter 5, Laws of 1889, with the other general provisions of the two statutes, were re-enacted.

The defendants place their contention that twenty-nine roads, or the territory originally embraced within those roads, are exempt from the restrictions of these acts upon two grounds: (1) That the restriction as to rates was not intended to and does not apply to certain roads, authority for whose consolidation must be found therein; (2) that the consolidation of certain roads was effected under other acts imposing no restriction, and the roads are exempted

therefrom by section 16, chapter 5, Laws of 1889, quoted above and re-enacted in section 43, chapter 156, Public Statutes. The first ground involves a construction of the general legislation; the latter, of special statutes relating to the particular roads.

"There is probably no jurisdiction in which a legislative purpose is carried into effect by a more liberal mode of construction than that which prevails in this state. But the most liberal construction is nothing more than the ascertainment of that purpose from competent evidence." *Boston etc. R. R.* v. *Railroads,* 65 N. H. 393, 399. "The history of legislation upon the subject, the circumstances under which the several statutes were passed, are properly considered in connection with the words of the statute, the context, etc., in order to ascertain the intention of the legislature." *Stanyan* v. *Peterborough,* 69 N. H. 372, 373. "The construction of a statute, as of any written document, is the ascertainment of the meaning of the language to those using it." *Opinion of the Justices,* 72 N. H. 605, 607. "It is the duty of the court to place itself as nearly as possible in the situation of the parties at the time the instrument was made, that it may gather their intention from the language used, viewed in the light of the surrounding circumstances." *Weed* v. *Woods,* 71 N. H. 581, 583. Words and phrases in a statute are to be construed according to the common and approved usage of the language, unless they have acquired a technical meaning in the law, or such construction would be contrary to the manifest intent of the legislature. P. S., *c.* 2, *ss.* 1, 2; *Opinion of the Justices,* 73 N. H. 625, 626. What, then, were the circumstances under which the language whose meaning is in dispute was used?

Prior to the adoption of the so-called Colby act in 1883, the policy of the state opposed railroad consolidation and relied upon the promotion of competition between rival roads as tending to improve service and lower rates. Laws 1867, *c.* 8; *Fisher* v. *Railroad,* 50 N. H. 200, 208. The act of 1883 purported to exclude competing railroads from leasing to each other, with an exception, however, which perhaps practically nullified the attempted exclusion. *Boston etc. R. R.* v. *Railroads,* 65 N. H. 393, 399. That it was considered necessary to insert a clause apparently excluding competing roads from consolidating by lease is strong evidence of the existing disapproval of such combination. Under the Colby act some leases were made, among them the Northern and the Boston, Concord and Montreal to the Boston and Lowell. The Northern lease was set aside in March, 1887. The Montreal lease was soon

after involved in litigation. In the session of 1887, attempts were made to secure legislation validating these leases, which failed. R. R. Comm'rs' Rep., 1887. The situation which faced the legislature of 1889 when it met in June is graphically portrayed in the report of the railroad commission to that body, dated May, 1889. The history of railroad operation in the state and the changes inaugurated in 1883 were fully discussed. It was claimed that the consolidations under the new policy had resulted in lower fares and freights with increased facilities to the public and had reduced the expense of operation. Attention was called to the struggle between the Concord and the Boston and Maine for the possession of the Northern and the Boston, Concord and Montreal, and the situation in which those railroads were left by the failure of the leases. R. R. Commrs' Rep., 1889, *pp.* 9–14; *Ib.*, 1888, *pp.* 10, 17.

In this situation and with this information before them, the legislature amended the Colby bill (Laws 1883, *c.* 100) by the passage of chapter 5, Laws of 1889. This was a division of territory between the contending forces  The legislators understood—or at least they had been informed officially—that the consolidations which had been effected had resulted in lower rates; and it is apparent that the legislation was asked for and granted upon the assumption that the proposed consolidation would result in lower rates for fares and freights. That expectation is written into section 17, chapter 100, Laws of 1883, and section 17, chapter 5, Laws of 1889: "The decrease in the operating expenses consequent upon the leasing or uniting of any roads shall be met from time to time by a reasonable and just reduction of fares and freights." It is also a reasonable inference from the situation that none of the roads anticipated any occasion for an increase in rates over those then existing. The legislation asked for by the Boston and Maine in 1887—the so-called Hazen bill—contained the provision (*s.* 14): "Rates for fares and freights existing August 1, 1887, on any railroad in this state shall not be increased without the consent of the legislature." So late as December, 1888, the defendants vigorously contended that the Hazen bill was the law of the land. Brief of J. H. Benton, Jr., in *Boston etc. R. R.* v. *Railroads* (65 N. H. 393), 163a Briefs and Cases 524.

In view of the former attitude of the state and the vigorous opposition to the change of policy inaugurated in 1883 (R. R. Comm'rs' Rep., 1889, *p.* 10), it would be reasonable to expect that some provision to prevent the use of the power granted to increase rates

would be attached to the grant. Such was the fact. The right to lease and unite then given was given with the proviso "that the rates for fares and freights existing August 1, 1883, shall not be increased on any part of the roads so leased or united." In 1885 the railroad commissioners report to the legislature: "The assurance was given by the Boston and Maine, and we have no evidence showing the contrary, that the rates existing on the leased lines and on the roads of the lessee have not been increased. No increase could lawfully take place under the act of 1883, which fixed the rates existing August 1, as the maximum rates." While this statement may not be an authority, it is of weight as showing the contemporary understanding under which substantially the same language was used again in 1889.

No reason has been given why roads consolidated in one way should be subject to the restriction, and the same roads put together by some other procedure should be exempt. The cause of the restriction is the consolidation of the rate-making power. It would naturally be inferred that the legislature intended to apply the restriction to all consolidations; and that when in the act of 1889 the restriction was imposed on "the roads leased or united under it," it was understood to apply to all consolidations effected thereunder. No reason is advanced in explanation of an intention to exclude certain roads from the restriction apparently generally imposed. The defendants stand upon the letter of the act, although apparently conceding that their construction is contrary to its purpose. Their claim relates to the original Boston and Maine line and a group of roads in the southeastern part of the state, conveniently described as the eastern roads. These were consolidated with the Boston and Maine under section 10 of chapter 5, Laws of 1889, which authorized the Boston and Maine "to acquire by purchase the road, franchises, and property" of certain roads, and the Concord of certain others, the purchasing roads being authorized to increase their capital stock for the purpose. The section closes with the following sentence: "After each of the purchases herein authorized, said purchasing corporations shall have and enjoy all the rights, privileges, and franchises theretofore had and enjoyed by the selling corporations." It is argued that this language implies freedom from the restriction because such was the condition of the selling corporations before sale, and that a transfer of all the rights and privileges of the selling corporations transferred their unrestricted right to make rates. But the source of this language shows

that no such meaning can be ascribed to it. The original statute which the legislature was amending, which contained the general provisions for union by the formation of a new corporation, after authorizing such action provides that the new corporation "shall have all the powers, privileges, franchises, property, and rights of every kind . . . of the corporations forming such union." Laws 1883, *c.* 100, *s.* 17. Such new corporation was given the powers of the old, subject to the proviso as to rates; and the same language used in 1889 must be construed to transfer the powers of the selling corporations, subject to the limitations of the act. The repetition of substantially the same language has some tendency to show that the method of purchase was considered merely another form of uniting two or more corporations. In the practical execution of the provisions, the only material difference seems to have been that in the one case the stockholders of the uniting corporations each exchange their stock for stock in a new corporation, while in the other the stockholders of the selling corporation receive for their stock, stock in the purchasing corporation. See the various agreements for consolidation printed in the reports of the railroad commission.

Among the roads which the Boston and Maine was authorized to purchase were two (the Worcester, Nashua and Rochester and the Manchester and Lawrence) which they held by lease under the law of 1883. No reason has been suggested why it should have been intended to relieve these roads from the restrictions of the law of 1883, by authorizing more intimate consolidation. The roads in question constitute three somewhat parallel routes across the state. They are rival roads competing at some places. An intent to remove the restriction from the roads upon which it would be most natural to place it is not to be inferred by argument from provisions inserted for other reasons. Section 13 of the act is: "Whenever any lease, union, or purchase authorized by this act shall be effected, copies of the votes . . . shall be filed in the office of the secretary of state." And it is said the statute recognizes thereby different methods by which the "unification" of railroads could be accomplished: lease, union of corporations, purchase. That is true; or, putting it in simpler language, the statute provides three methods of uniting railroads; by lease, union, and purchase. If they are united under it, the restriction is imposed. The restriction is not limited to the corporation formed by the union of two corporations. The eastern roads are united with the

Boston and Maine, as the English language is commonly used and understood. No authority can be found for giving a technical meaning to the word "united" in the law of railroad consolidation, which will confine it to unions which create a new corporation and exclude from its meaning unions which enlarge and continue one of the corporations. The construction contended for by the defendants is contrary to the letter and the intent of the statute and cannot be sustained.

As the original Boston and Maine is a road united with others under the act of 1889, it is unnecessary to consider whether as a lessee road under that act it is subject to the restrictions thereby imposed. And unless rates were less in 1883 upon that road than they were in 1889, it is equally unnecessary to consider whether, as a lessee road under the statute of 1883, the limitations of that act apply.

As it was specially provided that the right of any road to unite or lease should not be impaired by the legislation, under the second ground taken the question is the existence of the right to make the combination that has been made by particular roads with the Boston and Maine. To the entire validity of a lease or union there are two essentials: the assent of the corporate owners legally given and the assent of the state. The only question material upon this branch of the case is whether the assent of the state can be found outside of the legislation imposing the restriction. It is conceded that the restriction applies to all roads leased which must look to this legislation for the state's assent. This consent could be given by an act of the legislature specially authorizing a lease to the Boston and Maine. The only road which it is claimed has such right is the Manchester and Lawrence. This road was leased to the Boston and Maine, June 1, 1887, when the only authority for it was chapter 100, Laws of 1883. The claim that the restrictions of the statute do not apply rests upon section 1, chapter 301, Laws of 1887, by which the lease was ratified and confirmed. This lease when made complied with all the terms prescribed by law as conditions of the state's assent. Neither the state nor any stockholder of the Manchester and Lawrence who voted for the lease could have maintained a suit to set it aside. If the lease was illegal, its illegality did not extend beyond its violation of the partnership contract of the Manchester and Lawrence stockholders. *Boston etc. R. R. v. Railroads*, 65 N. H. 393. As the state's assent to the lease had been fully given by chapter 100, Laws of 1883, section 1 of chapter

301, Laws of 1887, ratifying and confirming the lease, added no validity to the lease as against the state. It is not shown that the lease contained any provisions the assent to which by the state in 1887 would disclose an intent to release the restrictions as to rates, and there is nothing in the act of 1887 disclosing such a purpose. The repealing clause (*s.* 9) repealed only such existing provisions as were inconsistent therewith. The lease confirmed and ratified was a lease made under chapter 100, Laws of 1883. It is not suggested that other authority existed for the lease. The provisions of chapter 100, Laws of 1883, were therefore parts of the lease when made, June 1, 1887, and when ratified, October 28, 1887. The object of the statute (sections 2 to 8, inclusive) was merely to prevent the possible destruction of the lease at the suit of dissenting stockholders, as was the fate of the lease of the Northern to the Boston and Lowell. *Dow* v. *Railroad,* 67 N. H. 1. The defendants' claim as to this road is not sustained.

Some of the roads, being authorized to lease, have made leases to another, and these leases have been assigned to the Boston and Maine. Whether the assignment is authorized by the original lease is a question for the original lessor road and its stockholders. Whether the state's assent to a lease to the Boston and Maine was given depends upon whether the road had the right to lease generally, or only to a particular lessee. The stockholders not objecting to a transfer of the lease to the Boston and Maine, their assent may be presumed. If the road could lease to the Boston and Maine without relying upon the legislation imposing the restriction, it is immaterial whether the lease is made directly or indirectly to the Boston and Maine; while if they were not authorized to make such a lease, they cannot do by indirection what they could not do directly, and the defendants must look to the legislation imposing the restriction for their authority to operate the road, and of course must operate it in accordance therewith.

The Concord and Portsmouth Railroad was authorized by section 4, chapter 2540, Laws of 1861, to "contract for the use or operation of their road, or any part thereof, with any railroad corporation now or hereafter connecting with said Concord and Portsmouth." Under this act an operating contract was made with the Concord Railroad, which has been assigned to the defendants. The Boston and Maine is a connecting road, and the state's assent to its operation of the Portsmouth is given by this act. This right of operation is therefore not limited by the restrictions of later

legislation, but only by those then (June 25, 1861) prescribed, viz.: "Trains for the accommodation of passengers shall be run daily between Concord and Portsmouth, without detention at Manchester; and there shall be no advance on the published freight and passenger tariffs as now established between Concord and Portsmouth and intermediate stations." The Suncook Valley (Laws 1864, *c.* 3035), the Peterborough (Laws 1869, *c.* 76), the Franklin and Tilton, originally incorporated as the Tilton and Franklin (Laws 1887, *c.* 220; Laws 1889, *c.* 206, *s.* 2), being authorized to lease to any railroad corporation, are not subjected to the restrictions in question upon a direct or indirect lease to the Boston and Maine.

The assent of the state to the acceptance of a lease by the lessee is as important as to the giving of a lease by the lessor. There is even greater reason for care in this respect; for the concern of the state relates to the operation of the railroad in the public service which the lease places with the lessee. Assuming, as claimed, that the prohibition against the increase of rates relates only to rates upon roads of the lessor and not to rates upon the lessee road, as is clearly the case under section 42, chapter 156, Public Statutes, the inhibition of the statute is against action by the lessee road; for it is that road only which would have the power over the leased road after the lease. To escape the restrictions of the statute, the lessee must show the assent of the state to its operation of the road expressed otherwise than through the statute containing the restriction.

Authority conferred upon the Pemigewasset Valley to lease to the Boston, Concord and Montreal (Laws 1874, *c.* 82, *s.* 2) did not authorize it to lease to the Boston and Maine directly or indirectly, or the Boston and Maine to accept a lease or operate the road. That authority must be found in chapter 156, Public Statutes. The Nashua and Lowell and the Peterborough and Shirley seem to be in the same situation. No authority is found for a lease of these roads to the Boston and Lowell and the Fitchburg respectively, and it follows that there is none for their indirect lease to and direct operation by the Boston and Maine, except the laws of 1883, 1889, and the Public Statutes. Both of these roads appear to have been authorized to unite and form a new corporation, the one with the Boston and Lowell (Laws 1874, *c.* 101), the other with the Fitchburg (Laws 1861, *c.* 2558). The case states that the union was by lease of the New Hampshire road in each case. If this legisla-

tion authorized the leases to the Boston and Lowell and to the
Fitchburg, it did not authorize a lease to the Boston and Maine.
It appears, moreover, to be matter of record, in the case of the
Nashua and Lowell, that the parties took advantage of the law
of 1883 and immediately thereafter re-executed the lease between
them.    R. R. Comm'rs' Rep., 1889, *p.* 115.

The Connecticut River after its union with the Ashuelot (Laws
1889, *c.* 201) and the Fitchburg after its union with the Cheshire
(Laws 1887, *c.* 257, *s.* 4) were not under any restriction as to rates,
but there is nothing in either act authorizing the new corporation,
as a New Hampshire road, to lease to the Boston and Maine or
any other corporation.    The Monadnock Railroad was authorized
to lease to any railroad (Laws 1869, *c.* 73) and could lease directly
or indirectly to the defendants.    The case states that July 26, 1892,
the consolidated Fitchburg Railroad became united and consoli-
dated with the Monadnock, under the name of the Fitchburg
Railroad Company.    Whether this union was understood to be
or was effected under chapter 156, Public Statutes, or under section
4, chapter 257, Laws of 1887, authorizing the Cheshire to unite
with one or more corporations, does not appear and is immaterial.
It is also unnecessary to consider the claim that since both the
Cheshire (Laws 1887, *c.* 257, *s.* 2) and the Monadnock (Laws 1869,
*c.* 73) had the power to lease, the consolidated Fitchburg road had
that power so far as New Hampshire is concerned; for the defend-
ants' brief discloses that, on the date of the lease to the Boston and
Maine, the Fitchburg was composed of the roads named and two
other New Hampshire railroads, the Brookline and the Brookline
and Milford, which were consolidated into a new corporation with
the Fitchburg as it then existed, under chapter 156, Public Statutes.
R. R. Comm'rs' Rep., 1895, *p.* 231.    Whatever effect the fact that
the Brookline and the Brookline and Milford were not in operation
July 24, 1889, may have as to those lines (a point hereinafter con-
sidered), the difficulty does not affect the other road, the Fitchburg
as it then existed, which thereby passed "into the possession of a
new corporation formed by the union of two or more corporations."
As to that road (the old Cheshire and the Monadnock), section 42,
chapter 156, Public Statutes, applies in terms, and the restriction
was not released by the lease to the Boston and Maine under the
same chapter.

Three roads which the defendants have possession of and operate,
under leases executed under the laws of 1883, 1889, or the Public

Statutes, are not formally leased to them, but they have a lease of all or substantially all the stock from the lessor roads which owned it; they are the Concord and Claremont, the Sullivan County,* and the Nashua and Acton. By section 8, chapter 5, Laws of 1889, the Boston and Maine were authorized to take a lease of the Concord and Claremont, subject to the restrictions of that act. The defendants' position appears to be that because the stockholders have permitted them to take possession and operate the road without a formal lease, the state's assent is unnecessary. Whether the lease of the stock and the acquiescence of the stockholders gives, as against the stockholders, a legal right to the possession and operation of the road is immaterial. The defendants may or may not have as perfect a title to the road as they would have through a formal lease duly voted and executed. If the Boston and Maine owned all the stock of the roads, its operation of them by virtue of such stock ownership might be legal or illegal; but it would not be a lease or a union authorized by anything except the special provisions of section 10, chapter 5, Laws of 1889, which was limited to the roads named therein. But the Boston and Maine does not operate the roads by virtue of stock ownership, but by virtue of a lease of stock to which the state assented upon condition. It is not disputed that the defendants hold the three roads under leases to which the state's assent was given with a restriction. That restriction, in the absence of special exception, applies to all the roads which the leases enable the defendants to operate and control. It is conceded that the Manchester and Keene is subject to the restrictions of 1883 and 1889, the Boston and Maine holding one half by virtue of a lease of the Boston and Lowell in 1887 and one half under a lease of the Concord and Montreal in 1895. The only query is whether the rates of 1883 or 1889 apply. It does not appear that there was a change in the rates between 1883 and 1889. If the right of control and operation is dependent upon both leases, which does not appear and which perhaps it might be inferred is not the fact (*Boston etc. R. R.* v. *Railroads*, 65 N. H. 393, 396, 399), the lower rates must govern. The greater restriction includes the less. The Concord and Montreal, as joint owners with the Boston and Lowell, owned one half of every portion of the road. The only lease the Concord and Montreal could make in 1895, assuming that the rates were lower in 1889 than in 1883, was upon the condi-

---

*See opinion upon motion for further hearing, *post.* 159.

tion that no rates should be charged on any part of the road in which the Concord and Montreal owned, which was every part, greater than were charged July 24, 1889. A lease made on such condition would be easily understood and executed. The fact that the condition is in the statute rather than in the indenture of lease presents no difficulty.

Six roads were not in operation July 24, 1889, and on that date there were no existing rates for fares and freights over them. One of these roads, the Franklin and Tilton, it has already been shown is not subject to any restriction. All the remainder have been leased or consolidated so as to be subject to the restrictions of the Public Statutes. It seems to be conceded that the restriction is specific and particular, and that it forbids the increase of the charge for the transportation of any particular article of freight above what was charged for the transportation of the same article in 1889. Upon this concession, the restriction cannot be applied to subjects or roads as to which there were no rates in existence in 1889. The question as to the new roads is probably of little importance; and as the case has been left before the court, the ruling now is, as to these roads, against the state. For the convenience of the parties, an attempt has been made to apply as well as to decide the legal questions involved.

The result is that the Concord and Portsmouth, the Suncook Valley, the Peterborough, and the Franklin and Tilton and the other roads put in operation since July 24, 1889, are not subject to the restrictions of either act. The remaining roads are confined to the maximum charges of August 1, 1883, or July 24, 1889. Although the question is transferred which of the dates governs in each case, there has been no argument upon it as to any roads except the Manchester and Keene, as to which it has been considered, and the Suncook Valley, to which latter it was found neither applied. As to the remainder, it is assumed the parties are not in conflict.

*Case discharged.*

All concurred.

After the filing of the foregoing opinion on February 11, 1911, the defendants moved for further hearing.

*Branch & Branch (Oliver W. Branch orally)*, for the motion.

*Edwin G. Eastman*, attorney-general, opposed.

PARSONS, C. J.  Upon the filing of the foregoing opinion, the defendants moved for further hearing as to the Sullivan County Railroad, and additional facts were by agreement presented for consideration.  It now appears that all the stock of the Sullivan County Railroad is owned by the Vermont Valley Railroad, a Vermont corporation; that in 1880 the Vermont Valley Railroad, as owners of the Sullivan County, entered into a contract for its operation with the Connecticut River Railroad, a Massachusetts corporation; that under the lease of the Connecticut River to the Boston and Maine, the Boston and Maine assumed the contract of the Connecticut River with the Vermont Valley, and it is claimed is now operating the Sullivan County thereunder without reference to the laws of 1883, 1889, or the provisions of the Public Statutes empowering one railroad to lease another.  By the consolidation of the Connecticut River with the Ashuelot under the act of 1889 (c. 201), the former corporation or the new corporation became subject to the laws of New Hampshire as to so much of its road as lay in this state.  But the right under which the Boston and Maine, by virtue of its lease of the Connecticut River, claims to operate the Sullivan County is a right of the Connecticut River antedating any subjection of that corporation to the laws of New Hampshire.  That right, if there is any such right, rests on the power of the owner of all the stock of a railroad to make a contract with another for the execution of its franchise.

Whether this contract made in 1880 is of any validity or not, it is clear it is not a contract of lease or union made under the laws of 1883, 1889, or the Public Statutes of 1891.  There is no claim that the contract was validated by this legislation.  Upon the questions presented for decision by the agreed case, it is immaterial whether the contract of 1880 is legal or illegal.  The state is now insisting upon the enforcement of the restrictions of the legislation of 1883, 1889, and 1891, upon roads leased or united under it.  To make out the state's case, it must appear that the lease or union was effected in the execution of powers or in the enjoyment of privileges thereby conferred.  If the contract of 1880 is one the Sullivan County had power to make, no rights acquired under it are affected by the later legislation.  If it is contrary to law, the operation of the road by the Boston and Maine is without legal warrant and equally without the terms of the enabling acts.  Under chapter 156, Public Statutes, the Sullivan County can lease its railroad to the Boston and Maine. It has not done so.

Claiming nothing under the statute, the defendants are not affected by its restrictions. Whether what is being done is in violation of law, is a question for investigation when properly presented in this or some other proceeding, should the attorney-general see fit to interfere. As the facts are now stated, the Sullivan County Railroad is not within the restrictions of section 42, chapter 156, Public Statutes. The opinion heretofore filed is modified to that extent.

*Case discharged.*

All concurred.