Merrimack,   }
April 13, 1914. }

### E. D. CLOUGH & CO. *v.* BOSTON & MAINE RAILROAD.

The provision contained in the railroad consolidation acts of 1883 and 1889 and in chapter 156 of the Public Statutes, that rates for fares and freights shall not be increased on roads leased or united thereunder, was not intended to prohibit the reasonable increase of any specific rate for a given service, but to forbid such increases as should result in the collection from the public of aggregate charges in excess of the cost of the same character and volume of traffic under the rates in force on August 1, 1883, and on July 24, 1889.

A shipper who has paid unlawful freight charges may maintain an action against the carrier for the excess, and is not prevented from recovering the same because such payments were made without protest.

A shipper who has paid freight charges which are alleged to be excessive under the law of New Hampshire, but which were collected in accordance with schedules of rates duly filed and published in pursuance of the federal statutes regulating interstate commerce, cannot maintain an action for the recovery of such excess in the courts of this state.

ASSUMPSIT, to recover back freight charges of $1,636 alleged to have been unlawfully collected from the plaintiffs by the defendants on certain shipments of lumber, to wit, the sum of $2 per car upon 818 carloads shipped between points on the Concord & Montreal, Northern, Concord & Claremont, and Tilton & Belmont Railroads and other points situated on the defendants' railway system. Transferred from the October term, 1912, of the superior court by *Chamberlin*, J.

The shipments were of four classes: (1) From a point in this state on one of said roads to another point in this state on the same road, (2) from a point in this state on one of said roads to a point in this state on another of said roads, (3) from a point in this state on one of said roads to a point in this state on some other line of railway operated by the defendants, and (4) from a point in this state on one of said roads to a point in Massachusetts on some other line of railway operated by the defendants; but each shipment was transported by the defendants, either wholly or in part within this state, over one or more railways operated by the defendants by virtue of leases and unions effected under chapter 100 of the Laws of 1883, or chapter 5 of the Laws of 1889, or chapter 156 of the Public Statutes; and the rates charged by the defendants and paid by the plaintiffs were $2 a car in excess of the legal rates

allowed by those statutes for such transportations, in that the same exceeded to that extent the rates in existence on August 1, 1883, and on July 24, 1889, for the like carriage.

The defendants pleaded the general issue with the following brief statement of defences:

1. That the rates charged the plaintiffs by the defendants for the transportation of said 818 carloads of lumber were neither discriminatory nor unreasonable in fact; that, on the contrary, they were the rates fixed for such service by the defendants' regularly established tariffs and charged by the defendants to all shippers for like service, at the time said carloads were transported, and did not exceed a fair and reasonable return for the service rendered; and that said rates in no respect contravened any statute or other law or regulation applicable in the premises, unless the mere fact that in certain instances they may have exceeded the rates in force August 1, 1883, or July 24, 1889, for the carriage of lumber of the same class between the same points in carload lots, taken by itself, constituted a violation of section 17, chapter 100, Laws of 1883, or of section 17, chapter 5, Laws of 1889, or of section 42, chapter 156, Public Statutes.

2. That the mere fact of such alleged excess, so far as it exists, did not constitute a violation of either of said statutes, because the rate limitations contained therein do not inhibit reasonable increases in rates on particular commodities when offset by decreases in rates on other commodities, provided that such increases and decreases in rates taken together do not result in collecting from the public a greater sum in the aggregate on the same volume and kind of traffic than would have been collected if the rates of 1883 and 1889 had been in effect; that during each year covered by the plaintiffs' shipments, while some of the rates for the transportation of lumber between certain points and on other particular commodities in certain instances exceeded the corresponding rates of 1883 and 1889, such excess was much more than offset by decreased rates on lumber between other points and on other commodities, and that, on the whole, the rates were not increased, but much reduced as aforesaid, so that the cost to the public of the freight traffic over each of said roads did not exceed, but on the contrary was much less, than the cost thereof had the rates of 1883 and 1889 remained unchanged; that during each of said years the aggregate sum which the defendants collected from the public in freight rates upon all the roads leased or united under said

statutes was less by the sum of $500,000 than the same would have been had the rates of 1883 and 1889 remained without readjustment; and that the plaintiffs' claim of unlawful overcharge is accordingly unfounded.

3. That during each year covered by the plaintiffs' shipments, the rates for passenger fares on all roads operated by the defendants, by virtue of leases and unions effected under chapter 100 of the Laws of 1883, or chapter 5 of the Laws of 1889, or chapter 156 of the Public Statutes, were greatly decreased from the corresponding rates in force when said statutes were enacted, so that the cost of passenger traffic to the public over said roads has been much less, to wit, $500,000 annually, than the cost thereof had the rates of 1883 and 1889 not been adjusted by the defendants as set forth in paragraph 2 hereof; that said decrease in passenger rates and the net decrease in freight rates has resulted in a net decrease of more than $1,000,000 annually paid by the public below the amount that would have been so paid if the rates for fares and freights in 1883 and 1889 had not been decreased as aforesaid; and that the plaintiffs' claim of unlawful overcharge is accordingly unfounded.

4. That even if the above mentioned rate limitations in the statutes of 1883 and 1889 and chapter 156 of the Public Statutes can be deemed to inhibit the increasing of any particular rates, notwithstanding more than an equivalent decrease in other rates as herein set out, the plaintiffs cannot maintain this action because:

(a) Said limitations were not designed to, and do not expressly or by implication, entitle a shipper to recover back freight charges paid by him in excess of the rates of 1883 and 1889, where the charges so paid are not discriminatory or unreasonable in fact; but said limitations can be invoked and enforced only by the state, in its sovereign capacity and in its sole discretion, by *quo warranto*, injunction, or other appropriate proceeding.

(b) With respect to each and all of the 818 carloads of lumber mentioned in the plaintiffs' specification and accompanying schedule, the plaintiffs voluntarily and without protest paid to the defendants the freight charges which they now complain of as excessive.

(c) In the case of rates on interstate traffic, the repayment of such alleged excess rates would be a violation of the penal provisions of the interstate commerce act and amendments thereto, inasmuch as the rates collected were lawfully filed and published according to the provisions of said act.

The plaintiffs thereupon moved to reject the brief statement, as follows:

As to the first specification of defence, because the matters therein set forth are wholly immaterial, and also because the defendants are estopped as matter of law to claim that rates charged by them in violation of section 17, chapter 100, Laws of 1883, or of section 17, chapter 5, Laws of 1889, or of section 42, chapter 156, Public Statutes, are reasonable and are legally binding on the plaintiffs.

As to the second and third specifications of defence, because the matters therein set forth are immaterial and because the claim therein made, that said statutes do not inhibit increases in particular rates on particular commodities, is erroneous as matter of law. Said statutes prohibit the increasing of any rates whatever upon any railroad leased or united under them, above the corresponding rates of 1883 or 1889; and it is accordingly immaterial whether the total transportation cost of the freight traffic on such road, or of the passenger traffic, or of the freight and passenger traffic thereon taken together, were increased or lessened.

As to the fourth specification of defence, because the averments thereof are immaterial and erroneous as matter of law. As to subdivisions (a) and (b) of said specification, it is the legal right of a shipper to recover back of the carrier, to the extent of the excess, any rate or fare paid by him on a railroad subject to said statutes, which exceeds the limit fixed by said statutes, no protest being required by him at the time of the payment of such rate or fare as a prerequisite to such recovery, as the plaintiffs were compelled to pay said excess in order to ship their lumber; and as to subdivision (c) of said specification of defence, it is erroneous as matter of law and immaterial.

It appearing that the questions of law presented by the brief statement and motion to reject the same are likely to be decisive both of the present action and of the other pending actions of like character, and that, even if a decision of those questions does not finally dispose of said cases, their determination is necessary before the material issues of fact can be ascertained and the cases intelligently and expeditiously tried, the presiding justice, by agreement of the parties, reserved questions so raised and particularly the following:

1. Whether the provision of section 17, chapter 100, Laws of 1883, of section 17, chapter 5, Laws of 1889, and of section 42, chapter 156, Public Statutes, forbidding an increase of fares and freights on

railroads leased or united under said statutes above the fares and freights in force on August 1, 1883, and on July 24, 1889, respectively, inhibit the increasing of any given rate on any given commodity, as claimed by the plaintiffs, or whether the same merely forbid increasing the total cost to the public of (a) the aggregate freight traffic over such a road, or of (b) the aggregate freight and passenger traffic over such road taken together, above what would have been the cost of the same character and volume of traffic under the rates of 1883 and 1889, as claimed by the defendants.

2. Whether the above rate limitations of those statutes entitle a shipper to recover back freight charges paid by him in excess of the limits thereby fixed, or whether said limitations are enforceable by the state alone.

3. Whether, if said limitations can be invoked by shippers, they can recover back such excess payments when the same were voluntarily made by them without protest.

4. Whether, if a shipper is otherwise entitled to recover back such excess payments, the provisions of the interstate commerce act and amendments, referred to in subdivision (c) of the defendants' fourth specification of defence, constitute a defence to the shipper's action for repayment of the excess in the case of interstate freight rates duly filed and published according to the provisions of said act.

*Martin & Howe* (*Mr. Howe* orally), for the plaintiffs.

*Streeter, Demond, Woodworth & Sulloway* (*Mr. Streeter* and *Mr. Demond* orally), for the defendants.

*James P. Tuttle*, attorney-general, and *Robert L. Manning* (by brief and orally), for the state.

PEASLEE, J. A portion of the charges here complained of were on interstate shipments. As to these the defendant alleges that they were collected according to rates lawfully filed and published according to the provisions of the interstate commerce acts. This is a valid defence. It is settled by a line of uniform decisions of the supreme court of the United States, that once schedules are so filed and published, the sole remedy of the shipper is by a complaint to the interstate commerce commission. This jurisdiction cannot be infringed upon by previous contract of the parties, nor by stat-

utes enacted by the states. It cannot be defeated directly or indirectly. The subject has been so fully considered by the tribunal whose exclusive province it is to finally declare the law pertaining thereto, that any discussion of it here is superfluous. *Adams Express Co.* v. *Croninger*, 226 U. S. 490; *Chicago etc. Ry.* v. *Company*, 226 U. S. 426; *Robinson* v. *Railroad*, 222 U. S. 506; *Southern Ry.* v. *Reid*, 222 U. S. 424; *Northern Pacific Ry.* v. *State*, 222 U. S. 370; *Louisville etc. R. R.* v. *Mottley*, 219 U. S. 467; *Pullman Co.* v. *Kansas*, 216 U. S. 56; *Western Union Tel. Co.* v. *Kansas*, 216 U. S. 1; *Armour Packing Co.* v. *United States*, 209 U. S. 56; *Texas etc. Ry.* v. *Company*, 204 U. S. 426.

Substantially all the arguments now advanced to support the plaintiffs' claim were presented in the cases above cited. It is useless to attempt to consider them here. The law upon a federal question has been fully elucidated by the federal court of last resort, and it only remains for the state courts to apply it to the cases in hand.

If the rates here filed contravened the terms of a contract made with the state by the defendant, or were contrary to the provisions of a state statute theretofore existing, the contract or the local law must yield to the power of congress to act upon the subject. The question what effect this may or may not have upon the leases and contracts of union made under the state statute is one which the present controversy does not present. As the validity of the defence is so clearly settled by federal authority, it is not necessary to now determine whether the statutes here under consideration were or were not intended to apply to any part of interstate carriage.

No conclusion has been reached as to the other questions involved in the case. The decision of this point is announced at this time, as it is understood that the state and the defendant desire to take action upon the subject under the statute passed by the last legislature.

All concurred.

At the January session, 1914, reargument was invited upon the questions which had not been decided in the foregoing opinion, filed June 27, 1913. The case was thereupon reargued in February, 1914.

*Dewitt C. Howe*, for the plaintiffs.

*Frank S. Streeter*, for the defendants.

*James P. Tuttle*, attorney-general, and *Robert L. Manning*, for the state.

Parsons, C. J.  "The proprietors of every railroad shall furnish to all persons reasonable and equal terms, facilities, and accommodations for the transportation of persons and property over their railroad. . . .

"If the proprietors of any railroad shall not comply with the provisions of the preceding section, they  . . . .  shall be liable to the party injured for his damages in an action on the case.

"The proprietors of every railroad shall cause to be posted in their depots a table of prices for the conveyance of persons and property. . . .  The rates shall be the same for all persons and for like descriptions of freight between the same points." P. S., c. 160, ss. 1, 2, 3.

In answer to the plaintiffs' claim to recover certain sums alleged to have been illegally collected of them for the transportation of lumber, the defendants offer to show that the sums collected were neither discriminatory nor unreasonable in fact, but were the prices fixed for such service by the defendants' regularly established tariff, and which were charged by them to all persons for like service, and that the amounts charged did not exceed a fair and reasonable return for the service rendered.  The plaintiffs' motion to reject the brief statement setting forth these facts is an admission for the purposes of the case in this court of the truth of the facts stated therein.  Hence the discussion must proceed upon the ground that the sums paid were fair and reasonable and the same as charged others for like service.  The question is: Had the plaintiffs a legal right to have their lumber transported for less than others paid, or for less than a reasonable rate?  They do not claim a special personal privilege for a lower rate than others, but contend that railroads leased or united under certain statutes are forbidden to charge for the transportation of lumber a higher rate than was charged upon certain dates named in those statutes.

Section 17, chapter 100, Laws of 1883, authorized the lease or union of certain railroads: "Provided, that the rates for fares and freights existing August 1, 1883, shall not be increased on any part of the roads so leased or united, and the decrease in the operating expenses consequent upon the leasing or uniting of any roads shall

be met from time to time by a reasonable and just reduction of
fares and freights." Chapter 100, Laws of 1883, appears to have
been expressly repealed in 1891. *State* v. *Railroad*, 76 N. H. 146,
148; P. S., c. 288, s. 15, *p.* 776. Whether section 17 was then re-
pealed, and whether the plaintiffs can recover by force of statutory
provisions repealed twenty years before, are questions not argued.
This provision, with a change of date, was reënacted in 1889 (*c.* 5,
*s.* 17) and in the Public Statutes (*c.* 156, *s.* 42). *State* v. *Railroad*, 75
N. H. 327, 330. The later enactments are not conditional in form,
and in the Public Statutes the non-applicability of the restriction to
lessee roads is made clear. *State* v. *Railroad*, 76 N. H. 146, 158.
But there is no evidence of a purpose as to the question in contro-
versy to do anything except to adopt the meaning of the clause
when enacted in 1883, so that the question is: What was meant in
1883 by the condition then imposed, "the rates for fares and freights
existing August 1, 1883, shall not be increased," without refer-
ence to the possible effect of a repeal of that section?

The plaintiffs claim "that the restriction is specific and partic-
ular, and that it forbids the increase of the charge for the trans-
portation of any particular article of freight above what was charged
for the transportation of the same article" (*State* v. *Railroad*, 76
N. H. 146, 158); or, expressing their contention in another way,
that the clause should be understood as if it read: No rate for fares
or freights existing August 1, 1883, shall be increased. The defend-
ants say the restriction is general and applies to rates as a whole,
and that if they have not collected of the public generally more
than was formerly charged for the same transportation, there has
been no violation of the statute. If the plaintiffs correctly construe
the statute, the admitted excess collection of $2 per car on lumber
makes out their case; while on the defendants' contention, if they
prove what they say they can there has been no violation of the
statute. The question is whether a strict and narrow application
of the language, or a general and liberal one, will more probably
effect the legislative purpose.

The facts before the court are that the particular charge is a
reasonable one, and that the total charge for freight transportation
collected and received by the defendants was $500,000 less in each
year than the rates of 1883 would have yielded, and the collections
for freights and fares $1,000,000 less. In the aggregate, the rates
have not been increased, but have been decreased to the extent
stated. Upon these facts, in a proceeding by the state to enforce

the state's contract in behalf of all the people of the state, it would be difficult to find a violation of the statute which would authorize equitable interference to secure to the plaintiffs an unreasonably low rate at the probable expense of the rest of the public. *State* v. *Railroad*, 75 N. H. 327. The result of the plaintiffs' contention as to the meaning of the statute is that the purpose of the legislature, if they understood the effect of what they were doing, was not to benefit the public generally, not to prevent taxation of the public as a whole more for railroad transportation than it was then paying, not to equalize transportation charges throughout the state; but that they did intend to benefit favored individuals or localities, to enable those who were procuring transportation at less than actual cost to continue to do so to the end of time at the public expense, and to perpetuate the inconsistent and discriminatory rates then in force. The plaintiffs do not present these considerations as the probable legislative purpose, but they say the legislature adopted the schedules of rates in existence as the maximum schedules beyond which no rate should be raised, as a convenient boundary and as a definite limitation; in short, that the legislature attempted legislation in detail as to rates.

The method of statutory interpretation here followed has been so fully explained in recent times that it would be idle to repeat at length the authorities, many of which are set forth in the defendants' brief. The question is what the words used meant to those using them. To ascertain that, the circumstances under which the language was used, the probable purpose, the general policy on the subject, prior legislation upon the subject, the entire legislation at the time, and the reasonableness or otherwise of one construction or the other, are matters competent for consideration. *Glover* v. *Baker*, 76 N. H. 393, 403; *State* v. *Railroad*, 76 N. H. 146; *Opinion of the Justices*, 73 N. H. 625, 626; *Opinion of the Justices*, 72 N. H. 605, 607; *State* v. *Railroad*, 70 N. H. 421, 423; *Opinion of the Justices*, 66 N. H. 629, 658, 659, 661, 663.

The legislation of 1883 was a change of policy, authorizing railroad incorporation by general law, substituting consolidation, with regulation by a commission, for enforced competition. *State* v. *Railroad*, 76 N. H. 146, 149. The movement for a change was inaugurated in 1881 by parties who sought a general railroad law, with the purpose, it was charged, of paralleling the Concord Railroad. The changes of policy in these respects made at the next session in 1883 were accurately defined. Acting upon the sugges-

tion of the governor, a railroad commission with greatly increased powers was created. If legislation in detail as to rates was also intended as a change of legislative policy, it is reasonable to assume that language of equal definiteness would have been used, and that language which is at least equally as susceptible of a general as of a particular application would not have been adopted.

In 1850, the legislature provided: "Every railroad corporation in this state shall, in the month of August in each year, agree upon and fix their rates or tariffs of toll for the transportation of freight and passengers over their road. . . . Such corporation shall, on the first day of September in each year, post up at all the stations and depots on their road a copy of such rates or tariff of tolls. . . . Such corporation shall not, for one year after the rates of toll are posted as aforesaid, . . . charge or receive any higher rates of toll, fare, or freight than shall be fixed upon and posted as aforesaid." Laws 1850, c. 953, s. 4. In 1852 it was enacted: "Any railroad corporation in this state shall establish from time to time . . . the rates or tariffs of tolls, . . . and the rates thus established . . . shall be the same for all persons and for the like descriptions of freight, . . . and no rates of fare or freight shall be at any time advanced except on thirty days' notice established and posted as aforesaid." Laws 1852, c. 1277, s. 1. The language of either of these sections would have expressed what the plaintiffs claim was meant. These provisions are to be found in the General Laws, where, after requiring the posting of a table of prices for the conveyance of persons and property, the statute enacts that "such prices shall not be raised." G. L., c. 163, ss. 1, 2. But the clause in question contains no reference to an existing table of prices or schedule of rates.

Prior to 1883, the legislature had in no instance, it is believed, attempted to regulate rates in detail. If advanced knowledge on the scientific construction of rates renders such a policy wise, there is no evidence such policy was then known to the legislators. The details of rate-making were by the several railroad charters placed in the hands of the directors, with certain provisions by which "the authorized net profits were made the standard of reasonable tolls." *State* v. *Railroad*, 69 N. H. 35, 47. Sections 11 and 13, of chapter 128, of the Laws of 1844, which has been called a general railroad law, govern the same subject. Section 11 provided that in any and every year when the net receipts exceeded the average of ten per cent of the expenditures from the commencement of operations, the

excess should be paid into the state treasury; and section 13 provided that "the rates of toll for freight of passengers and merchandise, when the net income of the stock shall exceed ten per cent, shall be subject to alteration and revision by the legislature, according as they shall deem just and expedient."

"The general statute was not a change of policy, but of method. Its purpose was not to obtain revenue, but to enforce the established policy of the state. The profits of the proprietors of railroads were limited to ten per cent for the sole purpose of securing to the public reasonable rates of toll. . . . Ten per cent annual profits remained, as before, the standard of reasonable tolls." *State* v. *Railroad,* 69 N. H. 35, 48. "The object to be attained is the same under either section—the limitation of tolls to reasonable rates." *State* v. *Railroad,* 70 N. H. 421, 430. These sections were not repealed in 1867, but were then reënacted, were in force in 1883, and are upon the statute book today. P. S., c. 157, ss. 19, 20; G. L., c. 158, s. 5; *Ib.,* c. 159, s. 9; G. S., c. 144, s. 5; *Ib.,* c. 145, s. 9. They disclose a settled legislative policy for the regulation of railroad tolls in gross and not by specific enactments as to particular rates. The statute requiring the sale of mileage books at two cents per mile is the only instance of a specific rate declared by legislative act that is recalled. Laws 1909, c. 107; Laws 1913, c. 92.

In 1883, the act before referred to, requiring uniformity of rates and equal facilities to all persons, was in force. G. L., c. 163, s. 2. It was not repealed in 1883, but the penalty of five hundred dollars for its violation was that year increased to one thousand dollars, by an act approved the same day as the consolidation statute. Laws 1883, c. 105. In 1879, the legislature prohibited railroads from making a higher charge for transportation by the carload to a station than was charged for like transportation for a greater distance. Laws 1879, c. 55. This provision, omitting the limitation to carload lots, was reënacted in 1883. Laws 1883, c. 100, s. 27. By section 26 of the same chapter, the directors of railroad corporations were required from time to time to "establish reasonable rates for the transportation of passengers and freight over their railroads." By section 4, chapter 101, of the same session (the companion act creating the board of railroad commissioners), it was made the duty of the board "to fix tables of maximum charges for the transportation of passengers and freights upon the several railroads operating within this state, and shall change the same from time to time as in the judgment of said board the public good may require."

One other consideration remains: the knowledge available in 1883 of the character of the then existing rates. It is unnecessary to take into consideration the conclusion of the public service commission, reached in 1912 after most laborious and exhaustive investigation, in which the rates existing in 1883 and 1889 are characterized as "inconsistent, discriminatory, and unscientific," as "antiquated classifications and haphazard tariffs." Pub. Serv. Com. Rep., Nov. 30, 1912, *pp*. 357, 366. If it could be said that the legislation was enacted with the light of this information, it would not require argument or consideration to conclude that, if another meaning could be extracted from the language, the legislature did not intend one which would impose such a condition upon the state. But though such information was not at hand in 1883, it was known at that time that there were a large number of independent railroads in the state. A few of them were operated under joint traffic agreements, but most of them were operated as independent roads, each competing with others for business and making rates at competitive points calculated to get business that naturally belonged to their competitors, making up what they lost on such business by charging those living at non-competitive points enough more than a fair price to make up for their loss on competitive business. Each road was a law unto itself as far as its charges for fares and freights was concerned. It could not have been understood that a uniform system of rates existed over all the roads of the state, or over any one road. The increase in the penalty for inequality of treatment and the reënactment with increased application of the long and short haul statute indicate conclusively that there was dissatisfaction with the existing arrangement of rates. There was more than a suspicion of discriminations for the benefit of favored shippers. The journal of the house (1883, *p*. 568) shows the introduction of a resolution for an investigation as to any unjust discrimination in fares and freights upon the Boston, Concord & Montreal and Northern Railroads.

Upon all this evidence, the conclusion seems irresistible that, in 1883, it was not intended to establish the existing rates as a maximum schedule of prices in detail. If such was the intention, there is no reason why some such term, or the expression "table of prices" found in the statute which was then under amendment, was not used, or why the particular language of the statutes of 1850 or 1852, before referred to, was not employed. It is not without significance that when by the same legislature, and as a part of the same legis-

lation, the duty of establishing maximum rates was imposed upon the railroad commissioners, the duty was defined to be "to fix tables of maximum charges." Laws 1883, c. 101, s. 4. If the legislature had intended to make the existing tables or schedules of charges a fixed maximum in detail, it can reasonably be assumed that they would have used the language they employed in placing the duty as to detail upon the commissioners. The policy of the state as to legislative regulation of freight tariffs had always been, and is now (State v. Railroad, 69 N. H. 35, 47) unless this statute is an exception, a regulation in gross and not in detail. If it had been the intention to reverse the established policy of the state in that respect, it is probable that language clearly and unmistakably expressing such intention would have been used.

Although the commissioners were authorized to fix the maximum rates, the legislative definition of reasonableness was not altered. In the judgment of the legislature, reasonable tolls were tolls which did not produce a net income exceeding ten per cent. For the roads leased or united, a new basis was provided—the gross amount of the rates then existing. Upon such interpretation, the directors could make from time to time reasonable tolls as required by the statute; the commission could establish maximum tolls in detail, changing them from time to time as the public good required; and the provisions for equality to individuals and rates proportionate to service, insisted upon as part of the same legislation, could all be carried into effect. It is obvious that if the roads and the commission were bound to cast-iron schedules in detail, the main legislative purpose of justice and equality could not be carried out unless the basic schedule was originally fair and just, and certain always to remain so. It is also certain that no exhaustive investigation was made in 1883 to ascertain what the rates then were; and it is a reasonable conclusion that the legislature could not have intended to establish the details of those rates as fixed marks for all time, without having first made some attempt to establish their reasonableness and justice. As the law stood undisturbed at this session, railroads were entitled to charge such tolls as would yield a net income not in excess of ten per cent. Few, if any, of the roads earned that income; but united, there would be no legislative barrier in the way of such an increase as would produce such an income, rendering probable a large increase in rates as the legitimate result of consolidation. Some limitation was necessary, and that was found in the amount then being paid for such service.

The legislation went further. It being claimed that the proposed consolidation would result in economies in management, it was further provided: "And the decrease in the operating expenses consequent upon the leasing or uniting of any roads shall be met from time to time by a reasonable and just reduction of fares and freights." Laws 1883, c. 100, s. 17. The profit of consolidation was reserved to the people of the state. The privilege of consolidation was granted upon the condition that the cost of transportation should not be increased, and the profit of the change in management be reserved for the people and not for favored individuals or localities. The section itself recognizes justice and reasonablenesss as the true basis of rates; and it is not probable that the legislature adopted as such basis, as between different individuals and places, tables or schedules of rates which the legislators did not know to be reasonable and just. It cannot be assumed they did not know that changes in conditions in the future might make the existing ratios and classifications unreasonable and unjust. The necessity for change "from time to time" was recognized in the power of fixing rates given the commissioners by section 4 of chapter 101, and to the directors of railroad corporations by a subsequent section of the chapter under consideration (s. 26). It is not probable that the contingency was not foreseen in which justice and reason would require increasing the rate on some subjects of transportation to render feasible lower rates on others.

In argument in favor of the plaintiffs' contention, it is said that there were expressions used by counsel and witnesses at hearings before committees of the legislature and in other places, tending to show that it was understood the prohibition would apply to specific rates. There is little evidence of that character. If there is any and it is competent, the opinions of individual counsel and witnesses as to what a written document will mean when executed, or what they think it means after execution, can be of very little weight. In most instances, the language used is the language of the act and helps neither side. It is to be remembered that the provision originated in 1883. In 1881, the attempt to get a general railroad law failed. In 1883, the controversy was between the Hobbs bill for an unlimited general railroad law, with right of the new railroad to lease generally, and the Colby bill, with its more limited provisions for new railroads and authority for lease and union of existing lines. After the practical failure of the Colby bill, the controversy in 1887, to which most of the documentary evi-

dence relates, was between the Concord and the Boston & Maine
Railroads over the possession of the Northern and the Boston,
Concord & Montreal Railroads. This was not a contest between
consolidation and competition, but a fight to obtain the fruits of
the policy of consolidation upon which the state had already en-
tered. Whatever was said in 1887, no legislation was founded
thereon. The contest was undecided. In 1889, the territory was
divided by agreement, and the legislation necessary to render the
Colby act effective was adopted without a struggle. *State* v. *Railroad,.*
76 N. H. 146, 149, 150. Obviously, what may have been said in the
bitter struggle of 1887 has little tendency to show what was meant
in 1883 or 1889. It may however be remarked, that at hearings
before the legislature in 1887 evidence was introduced of the aver-
age cost per ton per mile of existing tariffs, and similar comparisons.
are to be found in the commissioners' reports for 1886 (*p.* 28) and
1887 (*p.* 128). In 1888, the commissioners say (*p.* 52): "Since
1884, the railroad charges in New Hampshire have been reduced
upon the basis of the business done about $400,000 per annum."
If evidence of this character is competent, there is proof that the
total amount charged for transportation to the public was under
consideration.

Upon all the evidence competent for consideration, it seems more
probable that the legislature did not intend to make the existing
schedules in detail the maximum, but laid down as the measure of
reasonableness the gross sum then received for the amount of traffic
carried—the average charge per ton per mile. If the defendants
can show that from each of the roads over which the plaintiffs'
lumber has been transported they have not increased the average
charge per ton per mile, they are not guilty of a violation of the
statute. The evidence offered is competent. Further offer of
proof is made as to decrease in fares. Such evidence is also com-
petent. The expression "fares and freights" is naturally collective.
It might not require much evidence to sustain the conclusion that
"and" meant "or"; but the sole basis of reasonable rates recog-
nized in the statutes is the tolls from fares and freights together—
the net receipts from transportation. There is nothing in the act
upon which to differentiate the two sources of revenue. Section
11, chapter 128, Laws of 1844, is based on "net receipts," and section
13 provides for the regulation of "the rates of toll for freight of
passengers and merchandise."

It might be urged that this construction gives little protection

to the individual shipper. No one feeling that an unlawful toll had been collected of him would be prepared to litigate with a railroad the question of its entire receipts in 1883 and at the time complained of. But the legislature did not give in terms the right of recovery for a violation of the statute by the railroad. If the shipper has such a remedy, it stands upon other grounds than a statute creating it. That no such remedy was specifically given tends to show it was not understood a situation had been created in which such a remedy would be useful. The railroad commission were required to fix "tables of maximum charges," and to "change the same from time to time." By section 2, chapter 5, Laws of 1893, they were required to do so "upon the petition of any party interested." If the plaintiffs felt that they were charged an unjust, unreasonable, or illegal rate, they had a prompt and inexpensive remedy by application to the commission.

It is contended that the question was settled in *State* v. *Railroad*, 75 N. H. 327. It is true that in the opinion the provision is spoken of as providing "a maximum schedule beyond which the rates cannot be raised" (*p.* 330), and on page 331 it is said of the law of 1883: "It appears that it was intended to limit the power to increase rates on all roads leased or united under the act to the maximums stated in the schedules referred to in section 17." This last expression may be considered an inadvertence, as no schedules are mentioned in section 17, but it cannot fairly be interpreted as an intentional decision of a question at that time unsuggested by any one. The case relied upon was before the court upon demurrer to the bill which alleged that the defendants had raised the rates "upon all commodities transported." Whether the maximum was the total existing charge, or the charge on particular subjects, or for particular services, was a question not presented by the pleadings nor argued to the court. After the decision on the demurrer, the defendants filed an answer in which they claimed, among other things, that there had been no increase in the rates for freights and fares, because the increase in rates for freight was more than overbalanced by a decrease in rates for passenger transportation, so that the total amount charged the public for railroad service was less, instead of more, in proportion to the service rendered. While the case was again pending here upon exception to certain orders in the superior court, upon an agreed statement of facts a case was presented to this court to determine upon what roads the restriction of the statutes applied. Upon the facts stated, it ap-

peared that some of the roads leased under the Public Statutes were not in existence July 24, 1889, and it was thought that if the restriction related to a schedule of rates in force upon that date the statute could not apply, because there was no schedule to which to apply it; while if the restriction related to the general charge for transportation service, as the defendants' answer indicated might be claimed, the restriction might have some application. The question had not been argued; but as there was occasion for immediate decision of the main question, and upon the understanding that the state claimed that the restriction was specific and particular, in opposition to the claim put forward in the defendants' answer, the decision was then tentatively made against the state as to the new roads, upon this claim or concession of the state. Neither party asked for further consideration of the question, and the whole case was subsequently dismissed without prejudice by agreement, leaving the entire controversy unadjudicated. It may be remarked that in no instance has the controversy over railroad rates been submitted for judicial decision. Certain questions presented by what both parties have agreed, or what one party has alleged to be the facts, have been presented and decided; but a settlement of the law upon a judicial determination of the facts has not been and is not yet invoked by either party. An attempt to apply a decision based upon supposed or agreed facts to the actual facts may sometimes produce a wrong impression as to what was decided. There is a wide difference between the question whether the state may properly insist upon the terms of the agreement as to interstate rates so long as the other party to the contract claims the benefit and does not show that a failure to comply is caused by the command of superior authority (*State* v. *Railroad,* 75 N. H. 327, 331–335) and the question whether individual shippers can obtain relief as to interstate rates in violation of the controlling federal law.

The question whether the restriction of the act of 1889 and of chapter 156 of the Public Statutes is specific, applying to rates then in force for particular subjects and routes, or general, applying to transportation as a whole, is in this case first presented for decision. Why the defendants did not earlier take this position, as perhaps they might have done, is not material. It may be that, conscious of raises made in certain rates in 1903, they were unaware, until the thorough examination before the public service commission, that they were insufficient to bring the general charge for freight service up to the level of 1889. But for whatever reason the claim was not

earlier made, there is nothing which now estops them from making it. As the case is presented, the decision is merely that the evidence offered is competent and that the motion to reject the brief statement should, as to this contention, be denied.

If as a result of the trial it should appear that the defendants have collected of the plaintiffs any sums in excess of·the amounts allowed by the statute as hereinbefore construed, the plaintiffs are not prevented from recovering the same because the sums paid were paid without protest. The reasons for this conclusion are fully stated in the opinion filed by Judge *Peaslee,* in which, upon this point, all the justices concur.

*Case discharged.*

YOUNG, J., concurred.

WALKER, J., *concurring.* 1. The principal question presented is one of statutory construction. It is the duty of the court to ascertain from competent evidence what the legislature of 1889 meant when it provided that the "rates for fares and freights existng at the time of the passage of this act shall not be increased on the roads leased or united under it." Laws 1889, *c.* 5, *s.* 17; P. S., *c.* 156, *s.* 42. Was the phrase "the rates for fares and freights" intended to refer to and designate every individual rate then in existence upon roads that might subsequently consolidate, or was it intended to apply to the aggregate sum that might be received from reasonable rates upon an equitable readjustment of the existing rates? Was the statute intended to operate as an absolute prohibition of the increase of a single rate, however unreasonable, unjust, and discriminatory it might be? If not, then the only other suggested construction of the statute is that it prohibited, not the increase of specific rates, but the increase of the aggregate rates.

2. It is elementary that in the construction of a statute the court must take into consideration, in connection with, and as explanatory of, the language of the legislature, the circumstances existing at the time of its passage relating to the subject-matter involved, which will often show the object or purpose the statute was designed to accomplish and the sense in which its language was used. A citation of authorities upon this point is quite unnecessary.

3. It is conceded that up to 1889, when the policy of the consolidation of the railroads became effective, the protection of the people of the state against the imposition of extortionate rates by the numerous railroad corporations then existing was understood

to be largely secured by competition between the railroads, and that the result was that there was little uniformity of transportation charges throughout the state. Where competition was the sharpest, the rates were the lowest; and where there was little or no competition, they were the highest. No rational basis of rate-making, growing out of the cost of the service rendered in a given locality, was adequately recognized. As a rule, the rates were either too high or too low according to the degree of competition. At length it became evident that this competitive policy was a ruinous one both to the public and to the railroads. "For the lessons of experience, as well as the deductions of reason, amply demonstrate that the public interest is not subserved by competition which reduces the rate of transportation below the standard of fair compensation." *Manchester etc. R. R.* v. *Railroad,* 66 N. H. 100, 127.

4. To promote the interests of the people and those of the railroads, the statute in question was passed. It was believed that better service at a reduced expense would be secured by discarding the competitive method of railroad regulation and authorizing a general consolidation of the existing railroad lines. But in order to make it absolutely certain that the expense to the people of the state would not exceed the expense they then had to pay for the same volume of business done by the consolidating roads, it was provided that "the rates for fares and freights" should not be increased. The fundamental idea was that the state, meaning the people as a whole, should receive better transportation facilities than they had before enjoyed, without any increase of expense for fares and freights. They were not providing for special favors to some shippers and unreasonable burdens to others, but for the protection of the people as a political unit in the expenses of railroad transportation. That such was the legislative conception of the purpose of the statute, under the conditions existing at the time of its passage, would seem to be a reasonable deduction.

5. If the members of the legislature in 1883, when this provision of the statute was first enacted, understood the inequality and injustice of the then existing fares and freights brought about by railroad competition, if this was in fact one of the evils of that method of conducting the transportation business of the state which it was proposed to obviate, it would be strange if they used language in the statute which the court must hold simply continued and sanctioned the old schedules of fares and freights. We must at least

give them credit for understanding the general lack of uniformity of fares and freights in the different parts of the state; and upon this reasonable assumption, it would be difficult to find, in the absence of unequivocal language to that effect, that they were dealing with the specific rates then existing, which they desired should remain indefinitely unless reduced under legislative authority. It is unreasonable to infer that their idea was that uniformity of rates should in all cases be secured by reducing all rates for a given service to the lowest rate produced in any part of the state by the disfavored policy of competition, which naturally would be out of all proportion to the service rendered. It is apparent, and it must have been understood by the legislature, that an approximate equality of rates upon any reasonable basis could only result from a general readjustment thereof, increasing some and decreasing others. Unless, therefore, it was the purpose of the legislature to sanction the inequality of rates then existing, it cannot be found that the statute in question related exclusively to specific rates.

6. But if, as is claimed, the legislature of 1889 took no pains to investigate the rate question and knew nothing of the unequal accommodations and charges connected with transportation by rail in this state, it would be a reproach on a coördinate branch of the government for the court to hold that the legislature determined arbitrarily that the various schedules of rates then in force were in every instance sufficiently high, which in the interest of the public and in fairness to the railroads should not be increased in a single instance. It would be a severe reflection on the wisdom of the legislature to say that they came to that conclusion without understanding the facts upon which it was based. If it is conceded that they had little conception of what is called modern classification and scientific rate-making, now resorted to in the business of railway management, it cannot be assumed by the court in construing this legislative language that the legislators were ignorant of the material facts bearing upon the subject in hand, which were patent and not concealed by scientific mystery. It is unreasonable to find from their assumed ignorance of the facts of existing rates and charges that they intended to prohibit an increase of rates in all cases; while if they understood the inequality and the disproportionate charges for fares and freights, as it must be assumed they did, it is absurd to suppose their purpose was to continue them.

7. If there is evidence contained in unauthenticated reports of

hearings before legislative committees that indicate that some men thought, or assumed to think, that the statute of 1883 prevented the increase of specific rates, it is of very little weight or importance upon the question of legislative intention.   The question is, not what some men thought, or what individual members of the legislature conceived the language to mean, or what individual members of the court might think was most expedient under the circumstances (*Pollard* v. *Gregg, ante,* 190, 194), but what was the intention of the legislature as a composite body, expressed in, or fairly inferable from, the language embodied in the statute.   The evidence referred to is of doubtful admissibility, and if considered, it is of little consequence; certainly it is far from conclusive.   It has been held that the court, in construing an act, will not consider the motives, or reasons, or opinions expressed by individual members of congress in debate, but will look, if necessary, to the public history of the times in which it was passed.   *Keyport etc. Co.* v. *Company,* 18 N. J. Eq. 13, 24; *Cumberland County* v. *Boyd,* 113 Pa. St. 52; *Taylor* v. *Taylor,* 10 Minn. 107; *Aldridge* v. *Williams,* 3 How. 9; *United States* v. *Railroad,* 91 U. S. 72; *District of Columbia* v. *Company,* 108 U. S. 243; 2 Lewis Suth. Stat., s. 470.

8. When the belief is expressed in argument that the statute would not have been passed if it had been understood that it merely prevented an increase of charges in the aggregate, it might be equally germane to express the belief, in reply, that a distinct understanding that the statute would perpetuate and sanction the former unjust, inequitable, and discriminatory rates would have resulted in its defeat.   The expression of a belief either way upon this point is neither helpful nor important.

9. The fact that the legislature of 1883 created a board of railroad commissioners, giving it power "to fix tables of maximum charges for the transportation of passengers and freights upon the several railroads operating within this state" and to "change the same from time to time as in the judgment of said board the public good may require" (Laws 1883, c. 101, s. 4), must be considered in connection with the statute forbidding the increase of rates; and when so considered, the conclusion is greatly strengthened that rates in the aggregate on the uniting roads, and not the individual rates, constituted the subject-matter of the legislation under discussion.   Subject only to the prohibition against increasing the aggregate receipts from rates of transportation, the commissioners were fully authorized to readjust the specific rates in accordance

with a rational theory of justice to the railroads and equity and fairness to the people. But if the statute referred to specific rates only, it is not easy to see how the commissioners could fully perform the duty imposed upon them. Their duty was "to fix maximum charges" and to "change the same from time to time." Is it probable that the legislature, having prescribed the maximum rates, in the next chapter conferred in words the power to perform the same service upon the commissioners, intending, however, that their language in this respect should be held to mean nothing with reference to the uniting roads? It is very significant that such an intention was not expressed, as it easily might have been in a proviso, condition, or limitation defining the powers intended to be conferred upon the commissioners. The inference follows that the purpose was to empower the commissioners to readjust the transportation charges upon all railroad lines, raising some and lowering others, "as in the judgment of said board the public good may require." Of course, the legislative determination that the public good did not require such an adjustment of rates as would result in an increase of the receipts from the same amount of traffic was a limitation, and apparently the only definite limitation, upon the power of the commissioners with reference to the fixing of rates upon the consolidated roads. In this way unfair and discriminatory rates could be in a great measure avoided; and to accomplish such a result was the exident purpose of the legislature by the legislation of 1883 and 1889.

10. The statute of 1889, like the statute of 1883, also provided, as the concluding part of the section we have been considering, as follows: "And the decrease in the operating expenses consequent upon the leasing or uniting of any roads shall be met from time to time by a reasonable and just reduction of fares and freights." Is there such a difference in meaning between the expression "rates of fares and freights" in the first part of the section and the expression "fares and freights" in the last part, that it can be reasonably said that the prohibited increase applies to specific charges, while the reductions to be made on account of operating expenses refers to the fares and freights generally? No one seriously contends that the decrease in expenses was to be applied *pro rata* to all the individual fares and freights, but to a "reasonable and just reduction of fares and freights," considered as a whole or in the aggregate. No reason is suggested why these two similar expressions used in a single section of the statute should have two distinct and dis-

similar meanings.    The presumption is they were used in the same sense and did not relate to special rates.

11. Other reasons of evidentiary importance upon this question of statutory construction of the same general purport as the foregoing could be suggested; but it would seem from what has already been referred to, that the restriction imposed by the statute was intended to limit the rates in the aggregate and not in specific instances.    As the phrase in question is ambiguous in view of the subject-matter, I cannot reach the conclusion upon a reasonable construction of the language that the legislature intended to sanction the palpable inequalities and unjust discriminations in railroad rates, which resulted from the operation of an unreasonable competition, and to provide for their indefinite continuance, as a condition for railroad consolidation which it was believed would promote the public welfare.

I therefore concur in the opinion of the chief justice.

PEASLEE, J.    1. The statutes of this state provide that on railroads leased or united by virtue thereof the rates for fares and freights shall not be increased.    P. S., c 156, s. 42; Laws 1889, c. 5, s. 17; Laws 1883, c. 100, s. 17.    The first defence involves the meaning of this provision.    It is claimed that the statute does not prohibit the increase of some rates, provided that in the readjustment other rates are reduced to such an extent that there is no increase in the aggregate.    I dissent from the decision that this claim is sound.

The two later statutes on this subject (Laws 1889, c. 5, s. 17; P. S., c. 156, s. 42) are merely reënactments of the earlier one (Laws 1883, c. 100, s. 17).    State v. Railroad, 75 N. H. 327, 330.    It was said in the case just cited that the act of 1883 "was intended to limit the power to increase rates  .  .  .   to the maximums stated in the schedules referred to in section 17" (p. 331), and from this the plaintiffs argue that the question has already been settled adversely to the defendants.    But it is claimed that this particular question was not involved in that case, because the allegation there was that all rates had been increased.    When the case was again before the court, conclusions based upon this construction of the act were stated to be founded upon a concession that this was the meaning of the language used.    State v. Railroad, 76 N. H. 146, 158.

The acts of which the language under consideration forms a part marked a new departure in railroad legislation in this state.    The

earlier policy of protection to the public by competition was abandoned. This result was not brought about until the subject had been thoroughly discussed. There was widespread opposition to the change, and the argument that with competition eliminated there would be added danger of unfair treatment of the public was constantly urged. It was to provide against this danger that the prohibition was enacted. Much of that discussion has been preserved and is to be found in the state library. The three volumes entitled "Railroad Controversy" give some idea of what the people were at that time considering. An examination of this and other collections shows that the thought of the people was frequently directed to specific rates. Counsel who argued before committees of the legislature furnished printed tables showing in detail rates from one point to another. As one witness testified, these tables were prepared so that the individual could see just what the rates from his own town would be under the new law. In the cross-examination of a witness before a committee of the house in 1887, counsel for the Concord railroad asked: "There is a rate from Manchester to Laconia today?" Being answered affirmatively, he further inquired: "If the law provides that that rate shall not be increased, you will not be injured, will you?" One will search in vain for any suggestion in all that prolonged discussion that any rate was to be raised as a part of a larger readjustment of rates. In the report of the railroad commissioners to the legislature of 1889 (*pp.* 13, 14), it was stated in terms that the rates on some of the weaker roads were below what would yield any fair return upon the capital invested if they were operated independently; that the stronger roads were willing to agree to keep them there in return for the advantages of consolidation; and it was urged that such offers ought to be accepted by the state.

In view of these facts, it seems highly probable that the legislature in speaking of rates for fares and freights had in mind the specific rates then in force. These rates were definite boundaries. They provided an easily ascertained limit to the power of the railroads. G. L., *c.* 163, *s.* 1; P. S., *c.* 160, *s.* 3. Remembering that it was with reluctance that the old safeguards were abandoned, and that, whether justly or not, the people of the state were suspicious of every move toward consolidation, there would be every reason to expect that some such definite limitation upon the power to levy tolls would be insisted upon.

It may be conceded that the schedules then in effect were un-

scientific and discriminatory. But the only remedy then suggested was lowering the higher charges. The people of the state insisted upon assurances against any increase of rates, and the only prospective changes suggested by the representatives of the railroads were reductions. It can readily be surmised what the fate of these proposed statutes would have been if it had been publicly stated that the term "the rates for fares and freights" meant the aggregate of all rates, and that quite likely a good many rates would be raised.

Nor does the other provision of these acts, that the decreased cost of operation, incident to consolidation, shall be met by a decrease of rates for fares and freights, militate against the conclusion that the limitation of maximum charges applies to specific rates. If by reason of decrease in operating expenses it became equitable to reduce rates, the fact that no rate could be increased would not seem to interfere with the just decrease demanded by the new situation.

It is to be borne in mind that these statutes were not enacted by those expert in the present-day science of rate regulation, but by the New Hampshire legislators of thirty years ago. They thought and expressed themselves in the light of the knowledge of this subject then possessed by men in general. Whatever defects in their acts the larger knowledge of the present day and the experience of the intervening time may show were not apparent to them. The thought evidently uppermost in their minds was that the people were to be protected against any increase of rates. This they sought to express; and their intent to make the prohibition specific does not, to my mind, admit of serious doubt.

It is further argued that the provision of the companion act (Laws 1883, *c.* 101), giving the railroad commissioners power to fix maximum charges on all railroads, conflicts with the conclusion here reached. But there would seem to be no difficulty in making both acts effective. If occasion arose to alter rates within the permitted limit, the commissioners might so act. And as to railroads not leased or united under these statutes, the commissioners were free to act without such limitation. When the commissioners first acted under this law, they made sure that the rates in force in 1883 had not been increased on any lessor or lessee road, before giving their approval to the rate proposed. R. R. Comm'rs' Rep., 1886, *pp.* 18, 19.

The suggestion that the rates fixed were established for all time

is not entitled to very serious consideration.  Relief could be granted by any legislature, as indeed it was granted by the last one.  Laws 1913, c. 106.  The great point in mind was that the state proposed to retain the fullest control of the situation.  It intended to have a control which was of practical value, as distinguished from a merely theoretical one.  It intended also to reserve to each individual shipper a real weapon of defence against an increase of rates— of his rates, if one chooses to put it that way.  This was the consideration given by the roads for the privilege of consolidation.  The rates then discussed were the definite, individual sums for individual pieces of service.  This is what the railroad commission talked about in its report of 1889, urging the state to close a bargain whereby the rates on the weaker roads would be fixed.  There was no suggestion then that this fixing of rates was to be made inefficient by a process of dilution.  There was no hint that these rates were to be averaged with all the rates of all the system (no matter how great the system should become) before there could be any determination of how the facts were as to an increase.  Rates were thought of and talked about as units.

And this is the fair, sensible, non-technical meaning of the language used.  To the mind of the average New Hampshire legislator, the term "the rates for fares and freights" means the table of prices charged by the road.  It is believed that no one thought the statute meant anything else until within a very few years.  As late as 1909 it was said, in an opinion in which all the justices concurred: "It appears that it was intended to limit the power to increase rates on roads leased or united under the act to the maximums stated in the schedules referred to in section 17." *State* v. *Railroad*, 75 N. H. 327, 331.

Much time has been spent, upon both sides, in discussing the mere scholastic question of the fit construction of words.  Unquestionably, some logical argument for either conclusion is to be found.  But the case ought not to be, and is not, decided upon a nice balancing of fine deductions.  What is the central reason urged by the majority in the foregoing opinions?  It seems to me to be this: the conclusion reached is held to be the correct one because it gives the best results for the state.  In varying forms, the evils to flow from the conclusion that the rates referred to are specific rates are dwelt upon, until they are made to appear so great that the majority deem it impossible to think that the people of the state could have intended such consequences.  This was the whole tenor

of the last argument for the defendant.  It is improbable, they say, that the state could ever have desired or contemplated such a situation.  It is somewhat remarkable that such arguments should be made the basis for the decision of this case, in view of the fact that all the while the state appears here as a party and insists that it desires the result which the majority of the court think the state cannot desire.

There is considerable evidence how the state has viewed the question in the past.  It is all one way.  The first recorded official utterance is the report of the railroad commissioners in 1885.  In informing the legislature of what had been done under the act of 1883, they say (*pp.* 18, 19): "The assurance was given by the Boston & Maine, and we have no evidence showing the contrary, that the rates existing on the leased lines and on the roads of the lessee have not been increased.  No increase could lawfully take place under the act of 1883."  Again, in 1889, the commission advised the legislature in the following significant language (*p.* 14): "Our state has great advantage of position and circumstance in railroad matters, which it should avail itself of while it can be done. Because the managers of two wealthy corporations desire to extend their power and control by building up railway systems in which our roads must be links, they are willing to take these roads upon terms which make them, for the time being at least, sources of loss instead of profit.  Because they want our business and what goes with it, they offer to do it at cost or less, trusting to the indirect benefits that may accrue to them from doing a largely increased traffic upon their own roads to balance the draft upon their treasuries from our northern lines.  We should take them at their word." It is certainly fair to presume that the legislature acted upon this advice.  It passed the act of 1889 with full information that rates were unequal and that the purpose was to keep them so until the higher ones were reduced.  This is what the evidence shows the legislature thought.  And as before stated, the position of the state in all the litigation growing out of these acts has been that this is their meaning.  If there is any evidence that a different view has ever been expressed by the state, it has not been found.

These considerations seem to me to show that the assumption of the majority has no sufficient foundation.  That assumption imputes to the legislatures of 1883 and 1889 a knowledge that a statute applying to specific rates would be fantastic, irrational, and in every way unjust.  But the evidence is that all the advice given

by the state's railroad experts of those days was to the effect that such a law ought to be adopted. At the same time, counsel for the roads were urging upon the legislators the fairness and equity of the provision they now denounce. There is nothing to show that it was ever suggested to the legislators of 1883 and 1889 that a law applying to specific rates would be unjust. The majority opinions disregard all this evidence and seek to show by abstract reasoning alone the legislators' state of mind.

It is to be assumed, the majority say, that these legislators knew this and that, and, so knowing, must have concluded the law would be impolitic. As before suggested, one sufficient answer to this proposition is that the people of today know the situation well, and yet they are insistent in their demand that the law as to specific rates be retained. This was the sentiment of our recent legislatures. This is the view of our public service commission, whose indictment of the general rate situation is the basis of the last argument here for the defendant. This is the practical answer to the theoretical proposition that everybody must understand that the law is undesirable and unjust.

Nor is this the equivalent for a construction of statutes by a *plebiscite.* The question being what certain words mean to certain men, we must know how those men use words. If we would interpret the phrase of the street, we must be wise in the vernacular.

The majority, having become convinced in their own minds that a statute relating to specific rates would be unjust, conclude that other men must be of the same mind. This erroneous conclusion as to the mind of others might not be important in most cases. It is important here because it is the basis upon which the majority conclusion is made to rest. The argument is that since all men must think the law unjust and impolitic, therefore such result could not have been intended. The chain being no stronger than its weakest link, and the error as to the mind of others being one link, the conclusion lacks support.

Herein is the real difference of opinion in this case: The majority believe reasonable men generally must think a law applying to specific rates undesirable. The minority deny that such opinion exists, or has existed in the past, and believe that there is satisfactory evidence of a different public and legislative opinion. Starting with these fundamentally different views, it is almost inevitable that we should arrive at different conclusions in the interpretation of the statutes.

2. Another defence here made is that there is no private right of action for a violation of the terms under which leases of railroads are permitted by the state.  The statute is in effect an amendment to the railroad charters, which the corporations were at liberty to accept or reject.  *State* v. *Railroad,* 75 N. H. 327, 330.  When they accepted, the whole act became binding upon them.  They assented to its terms and cannot now repudiate them while attempting to retain the powers thereby conferred.  The rates in question form a part of the agreement.  Being so fixed by the legislature, there is at least a *prima facie* presumption that they are reasonable; and "the defendants, having accepted the benefits of the act, are estopped to show the contrary."  *State* v. *Railroad, supra,* 336; *Robinson* v. *Harmon,* 157 Mich. 266.  It follows from this, that the complaint here is for charging unreasonable rates.  Such an exaction gives rise to a cause of action in behalf of the individual injured thereby, both under the statute (P. S., *c.* 160, *ss.* 1, 2) and at common law.  *McDuffee* v. *Railroad,* 52 N. H. 430; *Texas etc. Ry.* v. *Company,* 204 U. S. 426, 436.

There was no occasion to insert in the acts of 1883 and 1889 a specific provision for a right to private redress.  The existence of the right must have been well understood after the decision in *McDuffee* v. *Railroad, supra.*  And section 28 of the act of 1883 furnished further evidence that this was then the legislative understanding.  That section provides a penalty for a violation of the long and short haul limitations in the preceding section.  It introduces the provision in this language:  .  .  .  "in addition to liability for all damages sustained by reason of such violation, shall be liable for each offence to a penalty," etc.  The defendant argues that this shows a legislative intent to give a private action for a violation of section 27 and to deny it as to others, as to which the act is silent.  But this is not the language ordinarily used to create a right.  It is rather that employed to express knowledge of a right already in existence.  It was used here to prevent the defence being made that the imposition of the penalty evidenced an intention to take away the existing private right.  If it had been the intent to here create a private right, the same language would have been used that was employed the same day in the reënactment of another statute upon the same subject.  "Every railroad corporation  .  .  . shall be liable to a penalty  .  .  .  and to the party aggrieved in an action of damages."  Laws 1883, *c.* 105.  The legislature of 1883 understood how to express the creation of a right in positive

terms. They understood equally well how to express a mere acknowledgment that a right existed. They recognized that this act was to be more than a mere private compact between the state and the railroads, and that damages to individual rights would be caused by its violation.

It is not reasonable to suppose that legislators, who were manifestly seeking to provide every safeguard against the possibility of unfair treatment of the people of the state, would give the shipper an action for damages if he could prevail upon the debatable issue of whether a rate was reasonable (P. S., c. 160, ss. 1–3) and deny him relief in a case where the rate charged was in violation of the express terms of an act to which the offender had agreed. The legislature was seeking new safeguards. It was with a view to giving added means of protection that larger powers were given to the railroad commissioners. Laws 1883, c. 101, s. 5. It was not the intent to make those remedies exclusive. *State* v. *Railroad*, 75 N. H. 327.

3. The third defence is that the payments here sought to be recovered were made voluntarily and without protest. In answer to this, the plaintiffs say that under the facts in this case the conclusion as to whether the payments were voluntary is one of law, and that the law is against the defendant. It would be of little assistance, in the subsequent trial of the cause, to merely decide that voluntary payments cannot be recovered, while involuntary ones may be. The real question which will present itself at the trial is what does or does not constitute a voluntary payment.

It is the settled law of the state that money voluntarily paid (that is, without coercion of any kind) cannot be recovered back (*Keazar* v. *Bank*, 75 N. H. 278, 280, and cases cited), and it is equally true that money paid under duress may be. *Alexander* v. *Pierce*, 10 N. H. 494; *Davis* v. *Smith*, 68 N. H. 253. And it has long been held that in an action for money had and received a recovery may be had for coercion which would not amount to the duress necessary to the avoidance of a contract. Keener *Quasi*-Cont. 426, note 2. "The action for money had and received, in its spirit and objects, has been correctly likened to a bill in equity; and it may in general be maintained whenever the evidence shows that the defendant has received or obtained possession of money belonging to the plaintiff, which in equity and good conscience he ought to refund to him. It lies only for money which, *ex æquo et bono*, the defendant ought to refund; as for money paid by mistake, or upon a consideration

which happens to fail, or for money obtained through imposition, express or implied, or extortion or oppression, or an undue advantage taken of the plaintiff's situation. In one word, the gist of this kind of an action is, that the defendant, upon the circumstances of the case, is obliged by the ties of natural justice and equity to refund the money." *Lockwood* v. *Kelsea*, 41 N. H. 185, 187, 188.

"Money paid to one who, because of his position, is under an obligation to discharge certain duties to the public, but who refuses to discharge such duty without the payment of a sum of money, to which he is not entitled, can be recovered as money paid under compulsion." Keener *Quasi*-Cont. 437. This proposition is fully sustained by the English authorities. *Dew* v. *Parsons*, 2 B. & Ald. 562; *Steele* v. *Williams*, 8 Exch. 625; *Parker* v. *Railway*, 7 M. & G. 253. In this country the weight of authority seems to be the same way. *Chase* v. *Dwinal*, 7 Me. 134; *Beckwith* v. *Frisbie*, 32 Vt. 559; *Mobile etc. Ry.* v. *Steiner*, 61 Ala. 559; *Chicago etc. R. R.* v. *Company*, 79 Ill. 121; *Louisville etc. R. R.* v. *Wilson*, 132 Ind. 517; *Scottish etc. Co.* v. *Herriott*, 109 Ia. 606; *Swift Co.* v. *United States*, 111 U. S. 22.

The rule is applicable to common carriers because of the similarity of their position to that of one holding a strictly public office. "A common carrier is a public carrier. He engages in a public employment, takes upon himself a public duty, and exercises a sort of public office." *McDuffee* v. *Railroad*, 52 N. H. 430, 447, 448. "Contracts of common carriers, like those of persons occupying a fiduciary character, giving them a position in which they can take undue advantage of the persons with whom they contract, must rest upon their fairness and reasonableness." *Railroad Co.* v. *Lockwood*, 17 Wall. 357, 380. In a few jurisdictions a different view has been taken. *Killmer* v. *Railroad*, 100 N. Y. 395; *Potomac Coal Co.* v. *Railroad*, 38 Md. 326; *Bernhardt* v. *Railroad*, 135 N. C. 258; *Kenneth* v. *Railroad*, 15 Rich. 284; *Arnold* v. *Company*, 50 Ga. 304. Several of these cases were disposed of because of rules as to duress which do not prevail in this state, or because of special circumstances which convinced the court that in the particular instance a recovery would be inequitable. In so far as they deny the general principle laid down by Keener, they are contrary not only to the weight of authority, but to the law as it has been declared in this jurisdiction. *Ford* v. *Holden*, 39 N. H. 143. In that case the defendant, who was one of the selectmen of Rumney, refused to put the plaintiff's name upon the check-list unless he paid his taxes for years preceding that in which he sought the right to vote, which

taxes had been abated. The defendant acted in good faith, and upon receiving the money from the plaintiff paid it to the town. In holding that the plaintiff was entitled to recover, the court say (*pp.* 147–149): "Upon every view that can be taken of the case, the plaintiff should have his remedy to recover back the money. He did not part with it voluntarily. It was not, indeed, extorted from him literally by duress of person or property, but it was by withholding from him his right. . . . It is the case of the exercise by the selectmen of their official power to obtain money from the plaintiff, which they honestly supposed they were entitled to demand as a condition precedent to their inserting his name upon the list, but to which by law neither they as selectmen nor the town were entitled. . . . It would be strange, indeed, if the party from whom the money was thus extorted could have no remedy at law to recover it back. It was paid into the hands of the defendant, and upon receiving it he held it as money received by him to the plaintiff's use. His liability to account for it as money so received is in no way affected by the fact that he afterward delivered it over to the town treasurer as money belonging to the town." This case was approved in *Plymouth* v. *Andover* (Grafton, March term, 1869), 49 N. H. 86, foot-note.

The principles upon which these cases were decided have been applied in this jurisdiction to a variety of situations. The rule here is that excessive payments made under agreements with public officers may be recovered back, even when made "voluntarily." *Edgerly* v. *Hale*, 71 N. H. 138, 148. Money paid to a pension attorney in excess of the fees allowed by the United States statutes may be recovered back, although the payment is made without demand or undue influence. This is because "the right of the pensioners to recover in such cases as this is necessary for the protection the statute was intended to give them." *Ladd* v. *Barton*, 64 N. H. 613. The same rule is applied to the payment of usury. "The law properly regards the lender on usury as the oppressor and the borrower as the oppressed, and therefore will not treat the payment of usurious interest as a voluntary payment, but rather as made under moral duress and through the constraint of a contract wrongfully obtained by taking advantage of the necessities of the borrower, and hence affords him relief." *Albany* v. *Abbott*, 61 N. H. 157, 158; *Cross* v. *Bell*, 34 N. H. 82.

This principle has a general application to statutes prohibiting certain contracts, when the "contracts are prohibited by statute to

protect one set of men against another." If "for that reason, or some other of like character, the parties are not *par delictum*, the law will lend its aid in favor of the innocent party, as in the case of usury." *George* v. *George*, 47 N. H. 27, 44; *Welsh* v. *Cutler*, 44 N. H. .561. In view of these decisions, there seems to be no doubt that it is the law of the state that payments to a common carrier in excess of what the carrier may legally charge can be recovered back in an action for money had and received, and that it is no defence that the plaintiff might have sought other remedies for the wrongful charges. *Chase* v. *Dwinal*, 7 Me. 134.

In some of the cases it appears to have been deemed an important fact that the plaintiff did or did not pay under protest; but this seems largely immaterial in cases of this class. The distinction has not been recognized in the cases in this state; and in each of those where a recovery has been upheld, it appears, either in terms or by necessary inference, that there was no protest. "If, independently of protest, the circumstances in which a payment is made would not justify a recovery thereof, the fact of payment under protest will not render such payment involuntary." Keener *Quasi*-Cont. 423, note 4.

As stated in the defendant's brief, the sole object of a protest in these cases is that it evidences the plaintiff's state of mind. It gives notice that he intends to claim his right to a repayment. The only cases where such notice would seem to be of importance would be those where the defendant had subsequently changed its position in reliance upon the validity of the payment. There is no suggestion of such a defence in the brief statement filed in this case, and *Ford* v. *Holden*, 39 N.H. 143, is an authority against it.

PLUMMER, J., concurred in the foregoing opinion.